[No. 4605.]

## BLAND v. THE PEOPLE.

1. **Practice in Criminal Cases — Using Unregistered Docked Horses—Evidence.**

   In a prosecution for driving and using an unregistered docked horse, it is not necessary to prove that the horse is not registered where it clearly appears that the docking was done after the expiration of the time within which he could have been registered.

2. **Police Power—Constitutional Law—Legislative Authority.**

   It belongs to the legislative department to exert the police power of the state and to determine primarily what measures are appropriate and needful for the protection of the public

morals, the public health or the public safety; and public inter-
ests demand that legislative enactments should be recognized
and enforced by the courts, unless plainly in violation of the
fundamental law of the constitution.

**3.  Docking Horses—Police Power—Constitutional Law.**

Chapter 93, Session Laws 1899, page 175, prohibiting the
driving, working or using of any unregistered docked horse, is a
reasonable and valid exercise of the police power of the state,
and is not in violation of the fourteenth amendment of the
constitution of the United States, providing that no state shall
deprive any person of life, liberty or property without due pro-
cess of law, nor of section 3, article II, of our state constitution,
declaring that "all persons have certain natural, essential and
inalienable rights, among which may be reckoned the right
* * * of acquiring, possessing and protecting property, and
of seeking and obtaining their safety and happiness."

**4.  Same.**

The fact that the legislature failed to state that the use
of an unregistered docked horse is in its opinion contrary to
the public morals, does not preclude the courts from sustaining
the statute upon that theory.

**5.  Same.**

The prohibition of the use of an unregistered docked horse
is not an unreasonable exercise of the police power of the state,
and is not in violation of that provision of the constitution of the
United States which provides that no state shall deny to any
person the equal protection of the laws, because the owners of
docked horses at the time of the adoption of the statute were
permitted to use them, provided they were registered within a
certain time.

**6.  Same—Punishment.**

The legislature may provide such punishment as in its judg-
ment the offense warrants, and the courts cannot interfere unless
the punishment is cruel or unusual. In the statute prohibiting
the docking of horses' tails and prohibiting the use of unregis-
tered docked horses, the prohibiting the use of unregistered
docked horses may be regarded as an additional punishment
imposed upon those who violate the law.

*Error to the District Court of Arapahoe County.*

Messrs. CRANSTON, PITKIN & MOORE, for plaintiff
in error.

Mr. N. C. MILLER, attorney general, and Mr. I. B. MELVILLE, for the people.

Mr. JUSTICE STEELE delivered the opinion of the court.

The information charges that the defendant, on, to wit, May 1st, 1902, at the county of Arapahoe, Colorado, did unlawfully drive, work and use an unregistered docked horse. Section 1 of the statute under which the information is brought, is as follows: "It shall be unlawful for any person or persons to dock the tail of any horse, within the state of Colorado, or to procure the same to be docked, or to import or bring into this state, any docked horse, or horses, or to drive, work, use, race, or deal in any unregistered docked horse or horses within the state of Colorado."

Section 2 provides that, "within 90 days after the passage of this act, every owner or user of any docked horse within the state of Colorado, shall register his or her docked horse, or horses, by filing in the office of the county clerk and recorder of the county in which such docked horse or horses may then be kept, a certificate, which certificate shall contain the name or names of the owner, together with his or her post-office address; a full description of the color, age, size and the use made of such docked horse or horses; which certificate shall be signed by the owner or his or her agent. The county clerk shall number such certificates consecutively, and record the same in a book or register, to be kept for that purpose only; and shall receive, as a fee for the recording of such certificate, the sum of fifty cents."—Chapter 93, Laws of 1899.

The defendant sold the horse in question February 19, and bought him back about the 1st of March, 1902. The horse's tail was docked between

the last-mentioned dates, and there is no evidence showing that the defendant docked the horse, or that he had possession of the horse at the time, or was in any way involved in the commission of the offense of docking the horse's tail. No proof was offered that the horse was unregistered, but the court held that, as the proof clearly established the fact that the offense of docking the horse's tail was committed some time between February 19 and the first week in March, 1902, no proof of non-registration was necessary. This ruling was correct. The act was approved in April, and became a law in July, 1899, and requires registration within ninety days after the passage of the act. It follows that registration under the act was impossible in this case. The very purpose of the legislature was to exempt from the operation of the statute those owning docked horses at the time of the passage of the act, and to secure them such exemption it was provided that they might, within ninety days from the passage of the act, register their horses. Owners of horses who did not avail themselves of the privilege of registration, and those who could not take advantage of the act, are guilty of a violation of the statute if they drive, work, use, race or deal in any unregistered docked horse. Although we hold that proof that the horse was not registered was not required in this case, it does not follow that such proof would not be required in a case where it appeared that the horse was docked while in this state, prior to or within ninety days after the passage of the act.

The defendant contends that the act in question violates the fourteenth amendment to the constitution of the United States, and section 3, article II, of our constitution, which provide, respectively, that "No state  *  *  *  shall deprive any person of life, liberty or property without due process of law, nor

deny to any person within its jurisdiction the equal protection of the laws''; and, that ''All persons have certain natural, essential and inalienable rights, among which may be reckoned the right * * * of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness.''

It is not asked that the whole act be declared unconstitutional, but that portion only which forbids the driving, working or using of an unregistered docked horse—registration being impossible.

Concerning the police power of the state, Mr. Justice Miller said, in the Slaughter-House cases, reported in 16 Wall. 36: ''This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property.'' And, quoting from an opinion by Chief Justice Redfield of Vermont, he continues: '' 'It extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the states * * * and persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state. Of the perfect right of the legislature to do this, no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' ''

And this court, In re Scrip Bill, 23 Colo. 504, said: ''While it is difficult to define the boundaries of the police power, it admittedly extends to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals.''

And in the case, Waters v. The People, 23 Colo.

33, it was held, that ''The killing of doves as they are released from a trap, merely to improve skill in marksmanship, or for sport and amusement, though without specific intent to inflict pain or torture, is within the inhibition of the statute, and punishable.'' In the course of the opinion, it was said: ''It is of common knowledge that, within the past few years, as incident to the progress of civilization, and as the direct outgrowth of that tender solicitude for the brute creation which keeps pace with man's increased knowledge of their life and habits, laws, such as the one under consideration, have been enacted by the various states, having the common object of protecting these dumb creatures from ill-treatment by man. Their aim is not only to protect these animals, but to conserve the public morals, both of which are undoubtedly subjects of legislation.''

The docking of a horse's tail is cruelty, not only because of the torture inflicted by the operation, but because, by depriving the horse of the use of his tail, he is deprived of the use of a weapon supplied him by nature for his protection from the myriads of winged pests that infest the land. Counsel insist that the question of cruelty is not involved, and that, assuming that the legislature has full power to prohibit docking, it has not the power to prohibit the use of the horse, after his tail has been docked; and, conceding that the use of property may be taken away for the public good, without compensation to the owner, that the prohibition of the right to drive, work and use an unregistered horse does not tend to the protection of the health, comfort or good morals of the community, and is not, therefore, a valid exercise of the police power. They say that, as the act itself is silent upon the subject of the purpose of the legislature in prohibiting the use of docked horses, unless we can clearly perceive from the terms of the act that

the thing prohibited necessarily affects the public morals, we should not sustain it; that the sight of docked horses does not call to mind the process by which the tail was obliterated; that there is no difference in appearance between a registered and an unregistered docked horse; and that a docked horse is not an unsightly object. That whether the statute can or cannot be justified as an exercise of the police power, is a judicial, and not a legislative, question.

It belongs to the legislative department to exert the police power of the state, and to determine primarily what measures are appropriate and needful for the protection of the public morals, the public health or the public safety.—*Mugler v. Kansas,* 123 U. S. 623.

"The public interests imperatively demand that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the constitution."—*Atkin v. Kansas,* 191 U. S. 223.

It is said that the police power of the state is founded largely upon the maxim: "Use your property in such manner as not to injure that of another"; and counsel insist that the driving of an unregistered docked horse injures no one, and that as the police power is founded upon the maxim stated, unless the use of an unregistered docked horse can be shown to be injurious to others, the statute cannot be sustained as a valid exercise of the police power. "The welfare of the people is the supreme law," is a maxim of the law; and it is upon these two maxims that the police power of the state is largely based. In the exercise of the police power, the legislature has a large discretion, and it is our duty to sustain such legislation unless it is clearly and palpably and beyond all question in violation of the constitution.

The fact that the legislature has failed to state that the use of an unregistered docked horse is in its opinion contrary to the public morals, does not preclude us from sustaining the statute upon that theory, for we must sustain the law if any sound and reasonable theory can be advanced as a basis for our judgment. It is urged by the attorney general that the legislation in question can be sustained under the police power of the state, because it tends to conserve the public morals; that seeing frequently the mutilated and disfigured animals sears the conscience and hardens the minds of the people, until they become accustomed to look upon these things as a matter of course. The same thought was expressed by Pope in a few lines. And it is as true in our day as it was in his time, that although we may instinctively hate vice, yet if we allow ourselves to become familiar with it, we, in turn, become depraved. It was upon this theory that Judge Carpenter sustained the law, and we fully agree with him that constantly seeing the disfigured and mutilated animals tends to corrupt the public morals.

We are of opinion that, in forbidding the use of a docked horse, the legislature has not exceeded its authority; that the interdiction is a reasonable and valid exercise of the police power of the state; and that the provisions of the federal and the state constitutions have not been violated. The questions here presented have been considered in very many cases by the supreme court of the United States. We shall not undertake a review of these decisions, but shall cite from a few of the more recent ones which, in our opinion, clearly sustain the right of the legislature to enact such statutes as the one now assailed.

The legislature of Kansas declared all places where intoxicating liquors were manufactured or sold to be common nuisances and that, whenever by the

judgment of the court, such place was found to be a nuisance, the sheriff should be directed to shut up and abate such place, and destroy all property used in keeping and maintaining such nuisance. One Mugler, at the time of the passage of the act, was the owner of a brewery, and engaged in the manufacture of malt liquors. The sale of which he was found guilty occurred in the state after the act took effect, and was of beer manufactured before its passage. The buildings and machinery constituting the breweries were of little value if not used for the purpose of manufacturing beer. It was claimed by Mugler that the judgment of the court sustaining the statute and directing the destruction of his brewery deprived him of his property without due process of law. The law was upheld by the supreme court in *Mugler v. Kansas*, 123 U. S. 623. Mr. Justice Harlan, in the course of the opinion, said:

"If, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the efforts to guard the community against the evils attending the excessive use of such liquor, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized."

Respecting Mugler's claim that his property, if not employed in the manufacture of beer, would be of no value, and that the prohibition of it being so employed was, in effect, a taking of the property for public use without compensation, and depriving the

citizen of his property without due process of law, Justice Harlan said:

"This interpretation of the fourteenth amendment is inadmissible. It cannot be supposed that the states intended, by adopting that amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community. * * * The principle, that no person shall be deprived of life, liberty, or property without due process of law, was embodied, in substance, in the constitutions of nearly, if not all, of the states at the time of the adoption of the fourteenth amendment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in the country is held under the implied obligation that the owner's use of it shall not be injurious to the community."

Letters patent granting to Henry C. DeWitt and assigns the exclusive right to make, use and vend to others an article known as Aurora Oil were issued in 1867. By a statute of Kentucky, passed in the year 1874, the sale or use of oil that would ignite or permanently burn at a less temperature than 130 degrees Fahrenheit was prohibited. The statute further provided that inspectors were required to brand casks and barrels containing oil, with the words "standard oil," or with the words "unsafe for illuminating purposes," as inspection showed was proper. The assignee of DeWitt was convicted on the charge of selling oil known as Aurora Oil, the cask containing which had been previously branded by an authorized inspector with the words "unsafe for illuminating purposes." It was admitted that the Aurora Oil could not be made to conform to the standard of test required by the Kentucky statute as a prerequisite to the right to sell within that state illuminating oils

of the kind designated. In the case *Patterson v. Kentucky,* 97 U. S. 501, the conviction was sustained and the law upheld. The court said: ''By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community, against the injurious exercise by any citizen of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government. The Kentucky statute under examination manifestly belongs to that class of legislation. It is, in the best sense, a mere police regulation, deemed essential for the protection of the lives and property of citizens. It expresses in the most solemn form the deliberate judgment of the state that burning fluids which ignite or permanently burn at less than a prescribed temperature are unsafe for illuminating purposes. Whether the policy thus pursued by the state is wise or unwise, it is not the province of the national authorities to determine. That belongs to each state, under its own sense of duty, and in view of the provisions of its own constitution. Its action, in those respects, is beyond the corrective power of this court.''

In *Beer Co. v. Massachusetts,* 97 U. S. 25, it is held that, ''All rights are subject to the police power of a state, and if the public safety or the public morals require the discontinuance of any manufacture or traffic, the legislature may provide for its discontinuance, notwithstanding individuals or corporations may thereby suffer inconvenience; and that as the police power of a state extends to the protection of the lives, health, and property of her citizens, the maintenance of good order, and the preservation of the public morals, the legislature cannot, by any con-

tract, divest itself of the power to provide for these objects.''

In *Lawton v. Steele,* 152 U. S. 133, it is said: ''The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. * * * Beyond this, however, the state may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests.'' And the court upheld the New York statute authorizing the summary destruction of nets set or maintained on the waters of the state in violation of the statute enacted for the protection of fish. At page 142 of the report, the court says: ''It is said, however, that the nets are not in themselves a nuisance, but are perfectly lawful acts of manufacture, and are ordinarily used for a lawful purpose. This is, however, by no means a conclusive answer. Many articles, such, for instance, as cards, dice, and other articles used for gambling purposes, are perfectly harmless in themselves, but may become nuisances by being put to an illegal use, and in such case fall within the ban of the law and may be summarily destroyed.'' And on page 140, the court says: ''While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard, and if the object to be accomplished is conducive to the public interests, it may exercise a large liberty of choice in the means employed.''

Mr. Justice Brown, in the case *L. & N. R. Co. v. Kentucky,* 161 U. S. 677, said: "Where the police power is invoked in good faith for the prohibition of a practice which the legislature has declared to be detrimental to the public interests, it will be sustained wherever it can be done without the impairment of vested rights. The general rule holds good that whatever is contrary to public policy or inimical to the public interests is subject to the police power of the state, and within the exertion of legislative control; and in the exertion of such power the legislature is vested with a large discretion, which if exercised *bona fide* for the protection of the public, is beyond the reach of judicial inquiry."

The foregoing authorities establish:

1.  That it is within the police power of the state to prohibit cruelty to animals, because such prohibition is a protection to the animals and tends to conserve the public morals.

2.  That in the exercise of the power the legislature may adopt such reasonable means as is necessary to accomplish the purposes of the statute.

3.  That to the legislature is confided a large discretion in declaring the public policy, and that, unless the legislation is clearly and palpably in violation of the fundamental law, it will be sustained.

4.  That all property is held under the implied obligation that the owner's use. of it shall not be injurious to the public.

These propositions being established by abundant authority, it remains to be determined whether the means adopted by the legislature for the accomplishment of the purpose of preventing the species of cruelty forbidden by the statute can be regarded as a reasonable exercise of the power confided to the legislature. It is for the courts to determine whether the act can be justified as a reasonable exercise of

the police power, but in the consideration of the question we should be guided somewhat by the primary declaration of the legislature; and if, in its judgment, it is necessary, for the conservation of the public morals and to effect the purposes of the act, to prohibit the use of docked horses, we should not disregard the determination by the legislature of that question. It is not a valid objection to the statute that only such horses as are not registered cannot be used. The legislature recognized the fact that many horses had been mutilated prior to the time the bill for the prevention of the cruel custom was introduced, and, instead of depriving the owners of the right to use such animals, justly provided that horses then docked might be used, provided they were registered within a certain time. At this time there was no law prohibiting the docking of horses' tails, and to have prohibited the use of docked horses would have been an unusual if not an illegal exercise of power. The defendant cannot complain if he comes under the ban of the law, even though means have been provided for other owners of docked horses to use their animals. The law excludes from its provisions those who use registered horses and includes those who use unregistered horses. All persons who owned docked horses at the time of the passage of the act were permitted to register them. Horses docked after the passage of the act are denied registration. The law operates upon that class of persons who use unregistered docked horses, but the classification is reasonable and not arbitrary, and is not objectionable as class legislation, and does not violate that provision of the constitution which provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. The character of the offense prohibited by the statute is such that something more than the mere prohibition

of the docking was necessary to accomplish the purposes of the act, and the means employed by the legislature are probably the most efficient that could be devised to prevent the docking. The whole scheme and purpose of the act would probably fail if the use of the docked animals were not prohibited, and as the act is clearly intended to conserve the public morals and to protect the horses, and as the means employed by the legislature to effectively prevent the cruelty prohibited by the statute are reasonable and consistent with the policy of the state as declared by the act, and are measures necessary for the protection of the interests of the public, it becomes our duty to uphold the statute. But, for another reason, the law can and should be sustained. It is competent for the legislature to provide such punishment as in its judgment the offense warrants; and, unless the punishment inflicted can be regarded as cruel or unusual, the courts cannot interfere. Although the statute expressly fixes the penalty for its violation as fine and imprisonment, or both, we know of no good reason why the provisions forbidding the use of unregistered docked horses may not be regarded as an additional punishment imposed upon those who violate the law. Counsel say the deprivation of the use of the unregistered docked horse was not imposed as an additional punishment upon the person who docked the horse, because the horse may have been docked in a state where the docking of horses' tails is not a crime, and brought here; and because if a burglar should break into a stable and steal a horse and then dock his tail, the owner, if he subsequently recovered his property, could not use his horse. The statute forbids the importation of docked horses. Whether that provision interferes with the right of congress to regulate commerce between the states is not involved in this case for the reason that the horse

in question was docked in Colorado.  What our ruling would be in a case where a thief had docked a stolen horse and the rightful owner had undertaken to use him after he was docked, we are not prepared to say; but the horse in question was not a stolen horse, nor was it docked by a thief.  With full knowledge of the law the owner of the horse docked him and sold him to Bland, and Bland, with full knowledge of the law, bought a docked horse.  Their property has not been taken without due process of law.  The law has not destroyed their property; they have destroyed their own property.  Bland sold the horse and within two weeks bought him back; in the interim the horse's tail was docked.  There was no necessity for docking the horse's tail, and the parties concluded to defy the law, and they must take the consequences.

We regard the law as just, wise and humane, and withal a lawful exercise of the power confided to the legislature, because it conserves the public morals and because it punishes the cruel and senseless treatment by man of his best and most constant friend.

The judgment is affirmed. *Affirmed.*