[No. 7347.]

### THE PEOPLE v. HUPP ET AL.

1. CRIMINAL LAW—*Polluting Streams*—A statute imposing a fine for discharging into any stream, ditch or flume, any refuse from a slaughter house, slops from an eating house or saloon (Mills Stat. sec. 1376, Rev. Stat. sec. 1817) is within the police power of the state, and it is the duty of the courts to enforce it.

The manager of a hotel or eating house who discharges into a running stream the slops from his premises, or other offensive matter, is within the statute, and liable to the penalty thereby imposed.

2. ——*Writ of Error by the People—Judgment*—In a prosecution for a statutory offense, evidence was given for the people tending to show the guilt of the accused. The court without considering the evidence, construed the statute as imperative, disregarded it, and discharged the prisoner. The judgment was reversed and the cause remanded, for further proceedings according to law.

*Error to Larimer County Court.*—Hon. FRED W. STOVER, Judge.

Mr. GEORGE A. CARLSON, district attorney, Mr. FANCHER SARCHETT, deputy district attorney, Mr. AB ROMANS and Mr. CHARLES B. WARD, for plaintiff in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

On July 14th, 1910, by leave of court, the district attorney of the eighth judicial district filed in the office of the clerk of the county court of the county of Larimer an information, supported by proper affidavits, charging the defendants with the offense of polluting a stream of running water in this state, contrary to the statute. The information contained one count and, excepting formal matters, is as follows:

"That Josephine Hupp and Henry Hupp, late of the county of Larimer and state of Colorado, on or about the 7th day of July, in the year of our Lord one thousand nine hundred and ten, at and within the county and state aforesaid, then and there being the owners, proprietors, managers and agents of certain public hotels, eating houses and closets therewith connected, to-wit, Hupp Hotel and Hupp Annex, did unlawfully empty and discharge by means of one certain drain and pipe into a tributary of the Big Thompson river, said tributary then and there being a stream of running water, certain obnoxious, fleshy, and vegetable matter and sewage, subject to decay, such as refuse from privies, closets and slops from eating houses, all connected with and a part of said Hupp Hotel and said Hupp Annex, contrary to the form of the statute in such case made and provided and against the peace and dignity of the same people of the state of Colorado."

The statute of the state, under which the charge is laid, is section 1376, Vol. 1, Mills' Ann. Stats., and reads as follows:

"If any person or persons shall hereafter throw or discharge into any stream of running water, or into any ditch or flume in this state, any obnoxious substance, such as refuse matter from slaughter-house or privy, or slops from eating houses or saloons, or any other fleshy or vegetable matter which is subject to decay in the water, such person or persons shall, upon conviction thereof, be punished by a fine not less than one hundred dollars nor more than five hundred dollars for each and every offense so committed."

On July 27, 1910, the case was called for trial, a jury impaneled and sworn, and the testimony of the people introduced showing: First. That the tributary described in the complaint was a stream of running water in Estes Park, Larimer county, Colorado; Second. That in the Park was situated two hotels, which were known as the Hupp Hotel and the Hupp Annex, and that the defendants were engaged in conducting the same; Third. That from one of the hotels slops from the kitchen and overflow from the cess-pool were being discharged into said tributary; and Fourth. That from a drain connected with the hotels, and having its outlet in said tributary, there was being discharged into the stream refuse from privy vaults.

At the close of the evidence for the state a motion for the discharge of the defendants was made and sustained in the following ruling:

"The defendants' motion to dismiss will be sustained. I do not believe this statute was ever meant to reach as far as it is being attempted to be brought at this time. I am not attempting to pass on the evidence. This should certainly be stopped, but as to bringing this as a criminal action and placing defendants in such a position that they might be convicted on a mere technical violation of the statute, does not seem to me to be embraced within the statute. The jury will be discharged, the defendants discharged, and the costs taxed against the people."

It will be seen from the above that the court did not pass upon the sufficiency of the evidence, but expressly declined to do so, and placed a construction upon the statute, which in effect made it inoperative and inapplicable to the case at bar and similar cases. It is contended that this construction is erroneous, and to have this question determined and the law declared, as to whether a person discharging refuse and filth, after the manner shown in this case, into a stream of running water in this state, is subject to and controlled by the provisions of the statute upon which the information is based, the

case is brought here on error for review under a specific law providing therefor.

The statute under consideration was passed by the legislature by authority of what is known as the police power of the state. That power has been variously defined. In Vol. 22, 2nd ed., American & English Ency. of Law, at page 918, it is said:

"The police power is an attribute of sovereignty and exists without any reservation in the constitution, being founded upon the duty of the state to protect its citizens and provide for the safety and good order of society. * * * It is founded largely on the maxim *sic utere tuo, ut alienum non laedas.*"

And at page 922 of the same volume this is said:

"Health being the *sine qua non* of all personal enjoyment, it is not only the right but the duty of a state or of a municipality possessing the police power to pass such laws or ordinances as may be necessary for the preservation of the health of the people."

In *Platte & Denver C. & M. Co. v. Dowell et al.,* 17 Colo. 376, 383, it is said:

" 'If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution.'—*Mugler v. Kansas,* 123 U. S. 623.

But if a statute is evidently designed to promote the public health, the public morals, or the public safety, and especially if it tends to produce the effect designed, it is valid so far as this specific objection is concerned unless there be a palpable invasion of constitutional rights."

In *State v. Griffin,* 76 Am. St. Rep. 139, 149, it is said:

"It is not for the court to inquire into the wisdom or unwisdom of such legislation. Whether the act 'be wise, rea-

sonable, or expedient is a legislative and not a judicial question. The legislature is as capable of determining the question of the wisdom, reasonableness, and expediency of the statute, and of the necessity for its enactment, as the courts. The only inquiry is whether the statute conflicts with the constitution.'—*State v. Marshall*, 64 N. H. 549, 550; *Farnum's Petition*, 51 N. H. 376, 378."

In *Durham v. Eno Cotton Mills*, 7 L. R. A., New. Ser., 321, at page 334, it is said:

" 'It is too late to question that the public power of a state (which is a part of its general legislative power) extends to the providing for every object which may be reasonably considered necessary for the public safety, health, good order, or prosperity, and which is not forbidden by some restriction of the state or federal constitution, or by some recognized principle of right and justice found in the common law.'— *Brown v. Keener*, 74 N. C. 714."

It is contended on behalf of the state that the act of discharging refuse, such as described in the statute, into a running stream of this state is absolutely prohibited by statute, for the protection of the health of the inhabitants generally, and if this legislation is fairly within the police power, with its wisdom or policy the courts have nothing to do, but are bound to uphold and enforce such enactment.

In *Bland v. The People*, 32 Colo. 319, 325, this court has adopted and approved well established principles, announced in opinions of the United States supreme court, as follows:

"It belongs to the legislative department to exert the police power of the state, and to determine primarily what measures are appropriate and needful for the protection of the public morals, the public health or the public safety.— *Mugler v. Kansas*, 123 U. S. 623."

" 'The public interests imperatively demand that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the

fundamental law of the constitution.'—*Atkin v. Kansas,* 191 U. S. 223."

" 'The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every state in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. * * * While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard, and if the object to be accomplished is conducive to the public interests, it may exercise a large liberty of choice in the means employed.' "—*Lawton v. Steele,* 152 U. S. 133.

And again in *Bland v. The People, supra,* at page 325, it is declared:

"It is said that the police power of the state is founded largely upon the maxim: 'Use your property in such manner as not to injure that of another'; * * * 'The welfare of the people is the supreme law', is a maxim of the law; and it is upon these two maxims that the police power of the state is largely based. In the exercise of the police power, the legislature has a large discretion, and it is our duty to sustain such legislation unless it is clearly and palpably and beyond all question in violation of the constitution."

It is not apparent upon what theory the trial court held this statute inapplicable to a case such as is presented by the information. The meaning of the statute is so plain, and the power of the general assembly thus to legislate so well settled, it can not be doubted that the court simply disregarded a legislative command, which, in the rightful exercise of its constitutional power, the general assembly might give. No other conclusion seems possible, in view of the express provisions of this statute and the law generally upholding the power of the legislature to enact laws, under the police power

of the state, for protection of health, public morals and the general welfare.

If it be contended that by the statute private property rights are invaded, in violation of constitutional provisions, that is adversely answered by numerous authorities. In *State v. Wheeler*, 44 N. J. L. 88, speaking to this proposition it is said:

"The whole act plainly shows a design to protect from pollution the waters of creeks, etc., used as the feeders for reservoirs for public use, without any reference to whether such pollution in fact appreciably affects the waters when arrived at the reservoir. Nor does such construction render this act objectionable. The design of the act is not to take property for public use, nor does it do so within the meaning of the constitution. It is intended to restrain and regulate the use of private property so as to protect the common right of all the citizens of the state. Such acts are plainly within the police power of the legislature. * * * Of the right of the legislature thus to restrain the use of private property in order to secure the general comfort, health and prosperity of the state, 'no question ever was or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' Redfield, C. J. *in Thorpe v. Rutland R. R., 27* Vt. 149. The same view has been always held in this state, and notably in the case of *State v. Common Pleas of Morris, 7 Vroom 72.* It was also there held that the extent to which such interference with the injurious use of property may be carried, is a matter exclusively for the judgment of the legislature when not controlled by fundamental law. Nor is there anything to render such legislation objectionable because in some instances it may restrain the profitable use of private property, when such use in fact does not directly injure the public in comfort or health. For to limit such legislation to cases where actual injury has occurred, would be to deprive it of its most effective force."

And again the *Durham v. Eno Cotton Mills, supra,* at page 331, the court says:

"The state is not bound to wait until contagion is communicated from a hospital established in the heart of a city. It may prohibit the establishment of such a hospital there, because it is likely to spread contagion. * * * Such instances might be indefinitely multiplied, but these are sufficient to illustrate this case. The object of this legislation is to protect the public comfort and health. For that purpose the legislature may restrain any use of private property which tends to the injury of those public interests. That the pollution of the sources of the public water supply does so tend, no one will deny."

The case of the *City of Durango v. Chapman,* 27 Colo. 169, was an action brought for the violation of an ordinance, section 3 of which provides that "the construction or keeping of any * * * pigsty * * * or any place or premise of whatever kind, the drainage from which is capable of contaminating or rendering water impure or unwholesome, is hereby prohibited upon the Animas river, or upon the banks thereof, * * *. It also provides that the keeping or establishment of any places by its terms prohibited, is a nuisance, and any person violating the section shall, upon conviction, be fined. The evidence established that the city takes its water supply from the Animas river; that defendant in error maintained a slaughter-house and pigsty upon its banks within five miles above the point where such supply was diverted; that drainage from such place would flow into a slough, which, in low water, appears to be separated from the main river by a bar through which the water would find its way into the stream. From a judgment discharging the defendant the city brought error, and the court, reversing the judgment, said:

"On behalf of the defendant in error, his counsel urges that the section of the ordinance under consideration is illegal, for the reason that the municipal authorities had no power to declare a pigsty or slaughter-house a nuisance *per se,* ex-

cept they be maintained within the limits of the city or within one mile beyond. * * * This is not the material or decisive question under the undisputed facts, and it is unnecessary to determine it in this case. The legislature has clothed the municipal authorities with power to protect the stream from which the inhabitants of the city derive their supply of water from pollution, within prescribed limits. In pursuance of this power, an ordinance has been passed for that purpose. It must be reasonably construed, and given that interpretation, if possible, which will effect the object of its passage. * * * The manifest purpose of the ordinance, as indicated by its title, is to protect the stream from pollution, from which the water supplied to the city for the use of the inhabitants is drawn. * * * It was not the mere keeping of these places within prescribed limits which was the particular thing prohibited, but the drainage therefrom, which flowed or might flow into the river, was the danger which the ordinance sought to obviate. * * * The fact that these places may have been well kept is no defense, for it needs no evidence to demonstrate, that if water flowing over the surface of an enclosure in which swine are kept, or from a slaughter-house or over the ground in its near vicinity, whether from natural causes or otherwise, reaches the stream from which the city draws its water supply, it will be rendered impure and unwholesome. Common knowledge teaches this would be the result, without proof."

The following additional authorities are cited, bearing upon the questions involved, and upholding the views here announced: *Fertilizing Company v. Hyde Park*, 97 U. S. 659; *North Chicago City Railway Company v. Town of Lake View*, 105 Ill. 207; *State ex rel. Board of Health v. Diamond Mills Paper Co.*, 64 N. J. Eq. 793; *Commonwealth v. Alger*, 7 Cush. (Mass.) 53; and Farnham on Waters and Water Courses, Vol. 1, sec. 137a.

We have examined with care the evidence adduced in this case and are well convinced that the court was wrong in

discharging the jury, and entering a judgment of dismissal, on the grounds stated. The case should have been submitted for a finding by the jury upon the evidence, under proper instructions. Being satisfied that the law is one which the legislature was authorized to pass, and which the courts should enforce, and since the court below by its finding practically held the statute inoperative and in effect nullified it, the judgment is reversed and the cause remanded, for such further proceedings as may be proper under the law.

*Reversed and Remanded.*

Mr. JUSTICE MUSSER and Mr. JUSTICE GABBERT concur.