BOARD OF TRUSTEES, UNIV. OF ARK. *v.* PULASKI COUNTY.

5-1643                                                    315 S. W. 2d 879

Opinion delivered July 1, 1958.

[Rehearing denied September 29, 1958.]

*Bruce Bennett,* Atty. General; *Roy Finch, Jr.,* Chief Asst. Atty. Gen'l.; and *Ray Trammell* of counsel, for appellant.

*William M. Lee, Henry B. Means, Reed Thompson, J. Frank Holt, John T. Jernigan, Joseph C. Kemp* and *Gardner A. A. Deane, Jr.,* for appellee.

GEORGE ROSE SMITH, J. By this suit the appellees, six counties and two cities, seek a declaratory judgment holding that the Medical Quota Act (Act 568 of 1957) is unconstitutional. The defendants compose the Board of Trustees of the University of Arkansas and govern the University Medical Center at Little Rock. The chancellor declared the act to be invalid and enjoined the defendants from attempting to enforce it.

By its preamble the act declares that the Medical Center is a state institution, supported by state-wide taxation, and that the use of its facilities by certain counties and municipalities has been disproportionate to comparative population. To correct this situation the act assigns quotas to each county and to each city of more than 10,000 people. Residents of the various counties and cities who are unable to pay for medical care may be treated at the state's expense within the limits of the assigned quotas, but each county or city must pay the actual cost of charitable treatment rendered to its residents in excess of its quotas. If any city or county fails to pay within thirty days after it is billed, the sum due may be deducted from state funds that the city or county would otherwise receive.

For the most part the appellees' attacks upon the validity of the act require little discussion. The coun-

ties' contention that the statute infringes upon the county court's constitutional power to control county finances has been rejected in a number of cases, the most recent being *Campbell* v. *Ark. State Hospital,* 228 Ark. 205, 306 S. W. 2d 313, which is not dissimilar on this point to the case at bar. An allied contention, that the financial burden upon these appellees will be so great as in effect to destroy their local governments, is sufficiently answered by that provision of the act which empowers each county judge and the chief administrative officer of each city to certify the eligibility of each resident applicant for free medical care. If the charges now assertedly due from these appellees appear to be unduly great, it is because they have failed to exercise their option to control admissions to the Medical Center.

A number of contentions are based on the fact that the quotas assigned to the various counties and cities are based solely on comparative population. Before these points can be discussed it is necessary to describe the quota system in some detail.

The act provides two different quotas for each of the seventy-five counties (and for the city of Marked Tree, as we shall explain later on) and for each of the twelve cities having more than 10,000 residents. The first quota represents the number of patient-days in the hospital that are allotted annually to each county and city. Arkansas county, for example, is allowed 1,728 patient-days a year at state expense, Ashley county 1,872, and so on down the list. The various separate quotas total 140,604 patient-days a year. In like manner the act assigns to each county and city an annual quota for emergency and clinic visits to the Medical Center. These various separate quotas total 100,000 visits a year.

The act itself does not state just how these numerical quotas were determined, except that it does declare parenthetically that they are apportioned pro rata according to population. The system is explained in detail, however, in the answer filed by the appellants. It

is there asserted that the Medical Center hospital has 450 beds, which can be utilized at 85 per cent of their full capacity for 365 days a year. This leads to a total of 139,613 patient-days a year (85 per cent of 450 x 365). This total was allocated among the counties and cities in proportion to their population as shown by the 1950 federal census. (That the actual total in the act comes to 140,604 instead of 139,613 is due in a negligible degree to the rounding off of fractions and, principally, to an obvious mathematical error by which Woodruff county was assigned 1,000 more patient-days than its relative population calls for. We assume that a mere mathematical error of this kind can be judicially corrected. See *Murphy* v. *Cook,* 202 Ark. 1069, 155 S. W. 2d 330.) When a county contained a city having more than 10,000 people the city's population was subtracted from that of the county in fixing their separate quotas. In the same way the Medical Center's annual capacity to take care of 100,000 emergency and clinic visits was apportioned on the basis of the 1950 census.

In addition to pleading the method of allocation in their answer the appellants offered testimony to show that the quotas were in fact determined in the manner just stated. This proof is a part of the record, though the chancellor ruled it incompetent. Perhaps the testimony would not be admissible to show what was in the minds of the legislators when the act was passed, but we see no reason why it would not be competent as tending to support the appellants' asertion that there is a sound factual basis for the quotas allotted to the counties and cities. We need not explore this issue, however, for we can determine the method of allocation without reference to the pleadings or the proffered proof. We take judicial notice of the federal census figures, *Street Imp. Dists. Nos. 481 and 485* v. *Hadfield,* 184 Ark. 598, 43 S. W. 2d 62, and it is a simple matter to demonstrate to a mathematical certainty that the various quotas were based upon comparative population as shown by the 1950 federal census.

It is first insisted that a classification based upon relative population alone is so unreasonable and arbitrary as to invalidate the act on the ground that it is local or special legislation. Ark. Const., Amendment 14. On this point the appellees insist that the residents of counties and cities geographically near the Medical Center will inevitably use its facilities more frequently than will citizens living far away. Hence, it is said, the assigned quotas should take into account relative distances as well as relative population.

This argument overlooks the basic purpose of the act, which is to distribute the burden of maintaining the Medical Center equitably among the several counties and cities. A quota system based upon population appears to us to be an altogether fair method of accomplishing the legislative purpose; certainly it is not so unreasonable as to warrant a holding that comparative population has nothing to do with the purpose of the act. See the *Hadfield* case, *supra*. The appellees' position really narrows down to the contention that, merely because they happen to be near the Medical Center, they should not be required to pay their fair share toward maintaining the institution. This position is obviously without merit.

A further contention is that the distinction between cities having more than 10,000 people and those having less than that number is arbitrary. We do not think so. The system involves no duplication or favoritism, for the population of these larger cities was deducted from that of their respective counties. The legislature may well have believed that a small community might be unable to afford to pay its ostensible share upon a quota basis, since serious illnesses befalling a few of its indigent citizens might result in medical bills amounting to thousands of dollars. Hence the risk of such a calamity was spread over the particular county as a whole. On the other hand, the legislature may have believed that the larger cities were sufficiently populous to warrant their being treated on the same basis as a county.

We think it plain that some classification as between large cities and small ones is justifiable, and it is not for us to say that the line as drawn by the legislature is arbitrary.

The act is also objected to on the ground that it is based only on the 1950 census, with no provision for an adjustment of quotas to meet future shifts in population. On this point the appellees cite a number of our cases holding that a classification based upon a particular census makes the act a local one, since no other city or county can ever be admitted to the class.

We do not regard those cases as controlling here. Such acts are local because they amount to a singling out of a particular community for special treatment. As Sutherland points out in § 2109 of his work on Statutory Construction (3d Ed.): "An act limited to a particular census is a form of identification." Our own decisions are to the same effect. As we said in *Ark-Ash Lbr. Co.* v. *Pride & Fairley,* 162 Ark. 235, 258 S. W. 335: "In other words, this statute selected Mississippi County as its only field of operation as unerringly as if it had been made to apply to that county by name."

That is not the situation here at all. The act does not attempt to identify any county or city by the subterfuge of referring to a particular bracket in the census figures. Quite the opposite, the counties and cities are referred to by name, and a quota is assigned to each. If the quotas were in fact fairly assigned on the basis of the 1950 census, it would not *now* be a valid objection that they might become discriminatory when the 1960 census is taken. The principle is well settled that a statute may be valid when enacted but may become invalid by changes in the conditions to which it applies. *Nashville, C. & St. L. Ry.* v. *Walters,* 294 U. S. 405, 55 S. Ct. 486, 79 L. Ed 949; *Atlantic Coast Line R. Co.* v. *Ivey,* 148 Fla. 680, 5 So. 2d 244; *Vigeant* v. *Postal Teleg. Cable Co.,* 260 Mass. 335, 157 N. E. 651; *Pennsylvania R. Co.* v. *Driscoll,* 330 Pa. 97, 198 A. 130. Hence if the Medical Quota

Act could be shown to be free from discrimination on the basis of the latest census, we would not hold it invalid upon the ground that it might later become discriminatory. It might have been better for the appellants to have been invested with power to reapportion the quotas to meet changes in population, as was done in the case of the Tuberculosis Sanatorium, Ark. Stats. 1947, § 7-311; but that precaution was not essential.

The appellees' remaining contention, however, is unanswerable; that is, that the Medical Quota Act discriminates in favor of Poinsett county and Marked Tree. It is of course well settled that an act which does not apply uniformly throughout the state is local if one county is arbitrarily selected for special treatment. "The exclusion of a single county from the operation of the law makes it local, and it cannot be both a general and a local statute." *Webb* v. *Adams,* 180 Ark. 713, 23 S. W. 2d 617; *Smith* v. *Cole,* 187 Ark. 471, 61 S. W. 2d 55.

In the act before us Marked Tree, a city in Poinsett County, is included in the list of counties and is given annual quotas of 211 patient-days and 151 emergency and clinic visits. The quotas for Poinsett county are 2,870 patient-days and 2,055 visits. If the population of Marked Tree had been subtracted from that of the county, as was done in the case of the larger cities, the act would be mathematically defensible and it might be assumed that the General Assembly had a sound reason for its special treatment of this city of less than 10,000.

That, however, was not done. For convenience we discuss only the quota for annual visits, though the discrimination exists in the patient-days quota as well. According to the census the 1950 population of the state as a whole was 1,909,511. Poinsett County, with a population of 39,311 (including that of Marked Tree), was therefore entitled to 2,058 of the 100,000 apportioned visits. It was in fact given a quota of 2,055. But Marked Tree, with a population of 2,878, which had already been counted in that of the county, was assigned

a quota of 151 visits, which, had there been no duplication, is mathematically correct on the basis of Marked Tree's population. Thus Poinsett county as a whole was allowed 2,206 visits, when its total population entitled it to only 2,058.

It further appears that the other counties and cities have been made to pay for the favoritism extended to Poinsett county and Marked Tree. Arkansas county, with a population of 23,665, was entitled to 1,239· visits on the basis of the state's true population of 1,909,511. But when Marked Tree's population is counted twice, making a fictitious state total of 1,912,389, Arkansas county then receives only 1,237 visits, and that is the figure in the statute. In short, Arkansas county is made to pay for two of the free visits allowed to Marked Tree. Next in alphabetical order, Ashley county, with an enumeration of 25,660, was entitled to a quota of 1,344, but the duplication reduced its quota to the statutory figure of 1,341. And so on down to Yell county, whose true quota of 736 was cut down to 735. Even Poinsett county was affected, its correct quota of 2,058 having been reduced to 2,055.

If we could conscientiously say that the demonstrable discrimination was inadvertent, it might be possible for us to hold, as we have intimated with respect to the mathematical error of 1,000 in Woodruff county's patient-days quota, that practically every one of the 176 numerical quotas in the act should be judicially construed to read other than they do. But we perceive no reason to suppose that the draftsman of the act intended for it to read differently. To include the city of Marked Tree in the list of counties was certainly not an oversight. To allot that city an undeserved quota of 151 and then to calculate every other quota so that Marked Tree's windfall was proportionately distributed among the other cities and the counties was not an oversight. We cannot escape the conclusion that the discrimination was deliberately written into the act, beyond the reach of judicial correction. As much as we

are in sympathy with the purposes of the act, we have no alternative except to hold that it violates the constitution.

Affirmed.

HOLT, McFADDIN, and MILLWEE, JJ., dissent.