GARRETT *v.* FAUBUS, GOVERNOR.

5-1824                                    323 S. W. 2d 877

Opinion delivered April 27, 1959.

*Kenneth Coffelt,* for appellant.

*Bruce Bennett, Atty. General,* by: *Clyde Calliotte, Asst. Atty. General,* and *Walter Pope, Kay Matthews,* Little Rock and *Thomas Harper,* Ft. Smith, for appellee, *Thomas E. Downie, Amicus Curiae,* Little Rock.

PAUL WARD, Associate Justice. On this appeal it is contended that Act 4 of the Second Extraordinary Session of the 1958 General Assembly is in conflict with the constitution of Arkansas and the constitution of the United States.

Briefly and generally stated, said Act 4 gives the Governor the right to close any school or schools in any particular school district whenever: (a) He determines there is actual or impending domestic violence endangering lives or property; (b) Federal troops are stationed in, on or about a public school; (c) He determines an efficient educational system cannot be main-

tained because of integration of the races in school. The Act also provides: In the event of a closing, an election shall be held within 30 days and if a majority so vote the school or schools shall be opened on an integrated basis; If any superintendent, or other employee of the school fails to cooperate in carrying out the closing order he or they will be replaced by the Governor until the next regular school election; any schools so closed shall not be reopened except by the Governor; If any section or provision of the Act is held unconstitutional it will not affect the remaining portions, and: The provisions of the Act shall be activated by proclamation of the Governor. The emergency clause sets forth the reasons for the passage of the Act and its immediate effective date.

On September 12, 1958, the Governor, pursuant to the provisions of the above Act, ordered the Senior High Schools in the Little Rock School District closed as of September 15, 1958, at 8:00 o'clock a.m. The reasons given by the Governor for the closing order, as they are set out in his proclamation, were: "I have determined that domestic violence within the Little Rock School District is impending, and that a general, suitable, and efficient educational system cannot be maintained in the Senior High Schools of the Little Rock School District because of integration of the races in such schools."

On the same day the proclamation was issued, appellant, as a citizen and taxpayer, filed a complaint against the Governor alleging that Act 4 violated the Constitution of the United States and the Constitution of Arkansas, and particularly Article 14 of the latter Constitution. The prayer was that, in event the schools were closed, a mandatory injunction issue against the Governor directing him to vacate and nullify the proclamation. The court was also asked to enter a declaratory judgment construing the constitutionality of Act 4.

To the above complaint demurrers were filed by the Attorney General and also by appellee's private attorneys on the ground that the complaint failed to state a

cause of action. The private attorneys also denied that the trial court had jurisdiction of appellee or the subject matter, and the Attorney General joined appellant in requesting a declaratory judgment. The trial court sustained the demurrer filed by the Attorney General, and dismissed the complaint — hence this appeal.

The only ground relied on by appellant for a reversal is thus stated in her brief:

"Act 4 of the Extraordinary Special Session of the General Assembly of Arkansas for 1958, is unconstitutional in that it violates Article 14 of the Constitution of Arkansas. Hence any act of the Governor based upon Act 4 is void for lack of constitutional authority, same being in violation of said Article 14 of the State Constitution."

The brief filed by *Amicus Curiae* attorneys, however, assumes that Act 4 will be considered in relation to both the State and Federal Constitutions and it is our purpose to do so.

*Does the Act Violate the State Constitution?* In our opinion Act 4 does not necessarily violate the State Constitution. We use the word "necessarily" advisedly. It is a well established principle of law that an Act of the Legislature which is constitutional on its face may become unconstitutional in its operation or under changed conditions. The landmark case announcing this principle is *Yick Wo* v. *Hopkins, Sheriff,* 118 U. S. 356, quoting from page 373:

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as to practically make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." Essentially the same principle was announced by this court in *Board of Trustees, University of Ark.* v. *Pulaski County,* 229 Ark. 370, 315 S. W. 2d 879, in these words: "The principle is well settled that a statute may

be valid when enacted but may become invalid by changes in the conditions to which it applies." In *Taylor* v. *City of Pine Bluff*, 226 Ark. 309, 289 S. W. 2d 679, we quoted with approval "that purposeful discrimination in the enforcement of an ostensibly fair law may violate the constitution. If the unlawful administration of the statute results 'in its unequal application to those who are entitled to be treated alike', there is a denial of equal protection.' Since Act 4 is unquestionably an attempt to exercise the police powers of the State about which more will be said later, and since this case comes to us on a demurrer, and since acts of the legislature are presumed to be constitutional, it is not incumbent on us to speculate on facts that might tend to invalidate this Act. In this connection, in the case of *Harlow* v. *Ryland*, 172 F 2d 784, the court, in considering the validity of a statute said: ". . . it is not incumbent upon the court to find the actual existence of facts which would justify the legislation; but if a state of facts which would justify the legislation can reasonably be conceived to exist, the court must presume that it did exist and that the law was passed for that purpose."

The remaining question then is: Does Act 4, on its face, violate Section 1 of Article 14 of our State Constitution, as claimed by appellant? This section reads:

"Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction."

It is our conclusion that no such constitutional violation exists. Article 14, Section 4, of our Constitution reads: "The supervision of public schools and the execution of the laws regulating the same shall be vested in and confided to such officers as may be provided by the General Assembly." Therefore, from a strictly constitutional standpoint, the legislature had the same right to authorize the Governor to take charge of schools as it has always exercised to authorize school boards to do so. There is nothing in the Constitution requiring

schools to be maintained in any fixed number at any fixed standard, or in any fixed places. If it did and if the requirements were those existing on September 27, 1958, then the constitution has been flagrantly violated for more than 75 years following 1874.

We have read with much interest the case of *Harrison v. Day,* 106 S. E. 2d 637, decided January 19th of this year, where the Supreme Court of Virginia held several segregation acts in conflict with the constitution of that state. Section 129, of the Virginia Constitution, in language essentially the same as in Section 1, Article 14 of our Constitution, requires the State to maintain a system of free public schools. However, Section 133 of their constitution places ''The supervision of schools in each county and city . . . in a school, to be composed of trustees . . .'' *etc.* The court held that this provision prevented the legislature from placing the supervision in the Governor. Of course no such restriction is found in our constitution as we have already pointed out. It is interesting to point out that the Virginia Supreme Court, in considering an Act which permitted schools to be closed because of the presence of Federal Troops, had this to say: ''. . . While we agree that the State, under its police power, has the right under these conditions to direct the temporary closing of a school, the provision divesting the local authorities of their control and vesting such authority in the Governor runs counter to Section 133 of the Constitution.''

We repeat that we find nothing in Act 4 which conflicts with Section 1, Article 14 of the Arkansas Constitution. The degree to which the police powers of the State may be extended will be further discussed later.

*Regarding the United States Constitution.* Technically speaking, the question posed for our solution is: Does Act 4 conflict with the first section of the 14th Amendment of the United States Constitution? This section, in substance, says: (a) All persons born or naturalized in the United States, and subject to its juris-

diction, are citizens; (b) No state shall make or enforce any law abridging the privileges or immunities of such citizen; (c) No state shall deprive such citizens of life, liberty, or property without due process of law, and: (d) No state shall deny such citizen equal protection of the laws. The Supreme Court of the United States in the case of *Brown, et al* v. *Board of Education of Topeka, et al.*, 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686, (on May 17, 1954) interpreted said section to forbid discrimination in the public schools. Ordinarily, it seems, that should have ended the matter because the *law* had been declared, but it did not. The court must have realized that the dosage was too potent for immediate administration, for it said: ". . . because of the great variety of *local conditions,* the formulation of decrees in these cases presents problems of *considerable complexity*" (our emphasis). For the above reason the court continued the matter for several months and gave all states permitting segregation an opportunity to be heard. After another hearing, the Court (349 U. S. 294) on May 31, 1955, handed down its final decision. Apparently the Court still recognized the dosage was too potent to be taken at one time without harmful after effects. Among other things it said:

"These presentations were informative and helpful to the Court in its consideration of the complexities arising from the transition to a system of public education freed of racial discrimination . . ."

"Full implementation of these constitutional principles may require solution of *varied local school problems. School authorities have the primary responsibility* for elucidating, assessing, and solving these problems . . ."

"*Because of their proximity to local conditions* and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal . . ."

"In fashioning and effectuating the decrees, the courts will be guided by *equitable principles* . . ."

"These cases call for the exercise of these traditional attributes of *equity power* . . ."

"To effectuate this interest may call for elimination of a *variety of obstacles* in making the *transition to* school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision . . ."

"Courts of equity may properly take into account the *public interest* in the elimination of such obstacles in a systematic and effective manner . . ."

"Once such a start has been made, the courts may find that *additional time* is necessary to carry out the ruling in an effective manner . . ." (Our emphasis).

We have set out the above quotes because it appears that they delineate the only sphere of judicial discretion left to us. While we deeply deplore the fact that the Supreme Court of the United States did not follow the clear legal precedents announced in *Plessy* v. *Ferguson,* 163 U. S. 537, 41 L. Ed. 256, 16 S. Ct. 1138, in *Gong Lum* v. *Rice,* 275 U. S. 78, 72 L. Ed. 172, 48 S. Ct. 91, and in numerous other decisions over a period of fifty years, instead of a long list of non-legal authorities, yet this Court will be subservient to the decision it did reach unless and until relief is afforded by the United States Supreme Court itself, by amendment to the Federal Constitution, by the intervention of Congress under Section 5 of the said 14th Amendment, or by some other means not readily apparent. Much has been said about the *supreme law of the land* in connection with the issue before us now. While we can see no room for argument since Article 6 of the United States Constitution itself says it, together with laws passed by Congress and certain treaties, *"shall be the supreme law of the land."*

*Our Field of Interpretation.* Notwithstanding what we have said above concerning the *supreme law of the land,* we feel that the issue before us falls within a sphere which allows this court some judicial discretion. That sphere is the application of the *police powers* of the state to the implementation of the decision in the *Brown* case, *supra.*

First, let us make our position clear. If Act 4 is viewed as giving the Governor the power to close all public schools permanently, it would, we concede, be in violation not only of the decree in the *Brown* case but also of the State Constitution, but we do not consider it that way. Without extending this opinion unduly by recounting all the history preceding and leading up to the passage of Act 4, we take it as well understood that the Act was intended to slow down the implementation of integration until it could be accomplished without great discomfort and danger to the people affected or until a lawful way could be devised to escape it entirely. In other words, the relief was intended to be temporary and not permanent. The terms of the Act itself bear out this interpretation.

There is nothing in the record to show what reasons the Governor had for believing that the peace would be disturbed or that the lives of citizens and property of the district would be endangered, and certainly there is nothing in the record to show his reasons were not well founded. Such being the case we will assume, as we have previously pointed out we may, that the Governor did not act capriciously.

If, in closing the schools temporarily, the Governor did so to protect the peace and welfare of the people, then he was justified, we think, under the well recognized police powers of the State. We believe that if the legislature had given the Governor the power to close schools temporarily in case of pestilence or insurrection in order to protect the people, no question of constitutionality would or could be raised. The difference between the real and the supposed situation is not one of law but of fact and the only difference in fact is one of degree. While the decisions dealing with *police power* are legion, the fundamental concept underlying its principle is no where better stated than in 11 Am. Jur. under the title *Constitutional Law*. In Section 251 it is stated: ". . . the police power is expressed by the well-known maxim '*solus populi est suprema lex*' (The welfare of the people is the supreme law). It has been said that this maxim is the foundation principle of all civil

government and that for ages it has been a ruling principle of jurisprudence.'' Also in the same text, Section 255, it is stated: ''The police power under the American constitutional system has been left to the states.'' Numerous footnote cases are cited in the text to support both propositions.

It makes no difference, we think, whether threat of the welfare of the people arises out of a pestilence or out of certain concepts of life that had formed over a period of years — even though these concepts may be based, as some insist, on prejudice or emotions. We believe it is common knowledge that people are most disturbed over emotional matters. The existence and extent of the emotional matters involved in the matter under discussion are too well known to need amplification.

Not only are the emotions and concepts mentioned above very real in the lives of the people of many sections of the nation, including this state, but we think they have been permitted and even encouraged by the same court that authored the *Brown* decision. A few excerpts from the opinions of the Supreme Court will suffice to explain. In the *Gong Lum* case, *supra,* where the court was dealing with the question of segregation, it said:

''. . . the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of federal authorities with the management of such schools cannot be justified . . .''

In *Robinson and Wife* v. *Memphis & Charleston Ry. Co.,* 109 U. S. 3, 27 L. Ed. 835, 3 S. Ct. 18, we find:

''. . . if the laws, themselves make any unjust discrimination, amenable to the prohibition of the 14th Amendment, congress has full power to afford a remedy under that amendment and in accordance with it.''

Much of the language used by the Court in the *Plessy* case, *supra,* must have been reassuring to the people for nearly fifty years. Some expressions of the court are set out, *viz:*

(Page 544) "The object of the amendment (14th amendment U. S. Const.) was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to *abolish distinctions based upon color, or to enforce social* as distinguished from political equality, or a *commingling of the two races upon terms unsatisfactory to each.*"

"Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the *state legislature* in the exercise of their *police power.*"

"The most common instance of this is connected with the establishment of *separate schools for white and colored* children, which has been held to be a *valid exercise of the legislative power . . .*"

(Page 550) "So far, then, as a conflict with the 14th amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a *large discretion on the part of the Legislature.* In determining the question of reasonableness it is at liberty to act with reference to *established usages, customs and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order.*"

(Page 551) "The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the negro *except by an enforced commingling of the two races.* We cannot accept this proposition. If the two races are to meet upon terms of social equality, *it must be the result of natural affinities, a mutual appreciation of each other's merits and a voluntary consent of individuals.*"

The court in speaking of integration of the races said:

". . . this end can neither be accomplished nor promoted by laws which *conflict with the general senti-*

*ment of the community* upon whom they are designed to operate.'' (Emphasis supplied in each instance).

In view of the overall situation as we have tried to point it out above, and having seen that the court itself in the *Brown* case recognized some consideration must be given to local conditions and customs in the implementation of its opinion, we are driven to the conclusion that there is, and by law and common sense should be, a large sphere of action available to the State Legislature, under its police power, to guide the course of segregation so as to protect the public welfare. As before intimated, we are aware that neither this Court nor the legislature can over-ride permanently the integration mandate, but some one must guide a peaceable, safe course for its implementation. Under veto power of the Supreme Court of the United States, we believe this course can better be charted by those closest to the people affected and therefore better acquainted with local conditions. It is within this framework that we uphold the constitutionality of Act 4 under the *police power* of the State Legislature.

It is in this connection also that we desire to stress what our courts, including the Supreme Court of the United States, have heretofore said:

*BARBIER v. CONNELLY* (1885) 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923

''But neither the amendment (14th)—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its *police power,* to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.''

*STATE v. MOUNTAIN TIMBER CO.,* 75 Wash. 581, 135 Pac. 645

''Having in mind the sovereignty of the state, it would be folly to define the term. To define is to limit that which from the nature of things cannot be limited,

but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The *police power* is to the public what the *law of necessity* is to the individual. It is comprehended in the maxim, *'Salus populi suprema lex'*. It is not a rule; it is an evolution.''

*STATE v. HAY,* 126 N. C. 999, 35 S. E. 459, 49 L. R. A. 588, 78 Am. St. Rep. 691

'' *'Salus populi suprema lex,—*the public welfare is the *highest* law—is the foundation principle of all civil government' . . . There is an implied assent on the part of every member of society that his own individual welfare shall, in cases of necessity, yield to that of the community; and that his property, liberty, and life shall, under certain circumstances, be placed in jeopardy, or even sacrificed, for the public good.''

*STATE v. BOONE,* 84 Ohio St. 346, 39 L. R. A. (NS) 1015

''The *police power* is inherent in sovereignty; and its exercise is justified by the necessity of the occasion. Its foundation is the right and duty of the government to provide for the common welfare of the governed. It is tersely expressed in the maxim, *'Salus populi suprema lex'* ''.

*DAVOCK, et al. v. MOORE, Controller,* 105 Mich. 120 63 N. W. 424, 28 L. R. A. 783

''Whatever differences of opinion may exist as to the extent and boundaries of the *police power,* and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and public morals. They belong emphatically to that class of objects which demand the application of the maxim, *Salus populi Suprema lex;* and they are to be attained and provided for by such appropriate means as the legislature may devise.''

*PEOPLE v. LINDE,* 341 Ill. 269, 173 N. E. 361, 72 A. L. R. 997

458

"The power that the state may exercise in this regard is the overruling law of *necessity* and is founded upon the maxim, *Salus populi est suprema lex.* The existence and exercise of this power are an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders all rights the exercise of which would prove hurtful to the citizens generally."

*BLAND v. PEOPLE,* 32 Colo. 319, 76 P. 359, 65 L. R. A. 424, 105 Am. St. Rep. 80

" '*The welfare of the people is the supreme law*', is a maxim of the law, and it is upon these two maxims that the *police power* of the state is largely based. In the exercise of the *police power* the *Legislature has a large discretion,* and it is our *duty* to sustain such legislation unless it is clearly and palpable and beyond all question in violation of the constitution." (Emphasis supplied in each instance).

That complete integration of the schools in many communities presents a social problem fraught with frightening consequences in the minds of many people is a fact that cannot be ignored or avoided. If those people are convinced they are being forced into acceptance, without time for adjustment, by a few people who are far removed from the scene and who, they feel, are not sympathetic or understanding, the problem becomes more frightening. On the other hand, if these same people were given assurance that they would be guided by understanding and sympathetic local officials, it would tend to allay their fears and also would, no doubt, hasten the day when a complete solution would be achieved with a measure of dignity, peace and harmony. It is in this concept that we rely so heavily on the police power of the State to protect the peace and welfare of the people, and to effect a workable solution of this momentous problem—all within the framework of the *Brown* opinion. It was to this end that Act 4 was passed by the legislature and it is to this end that we hold it is constitutional.

In speaking of the deep and disturbing feelings of the affected people, we take judicial notice of numerous elections where the people have expressed their feelings in no uncertain terms, and also of the adoption of Amendment 44 to the State Constitution. Section 3 of that Amendment reads: "The General Assembly shall enact such laws under the police powers reserved to the states as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas." Other portions of the amendment make it clear that the Legislature was not only empowered but was directed to protect the safety and welfare of the people.

In view of what we have said it follows that the decree of the trial court must be, and it is hereby affirmed.

Affirmed.

HARRIS, C. J. and ROBINSON, J, concur.

HOLT, McFADDIN and GEORGE ROSE SMITH, JJ., dissent.