323 S.W.2d 877 (1959)
Mrs. Gertie GARRETT, Appellant,
v.
Orval E. FAUBUS, Governor of Arkansas, Appellee.
No. 5-1824.
Supreme Court of Arkansas.
April 27, 1959.
Kenneth Coffelt, Little Rock, for appellant.
Bruce Bennett, Atty. Gen., by Clyde Calliotte, Asst. Atty. Gen., Walter Pope, Kay Matthews, Little Rock, and Thomas Harper, Ft. Smith, for appellee.
Thomas E. Downie, Little Rock, amicus curiae.
WARD, Justice.
On this appeal it is contended that Act 4 of the Second Extraordinary Session of the 1958 General Assembly is in conflict with the Constitution of Arkansas and the Constitution of the United States.
Briefly and generally stated, said Act 4 gives the Governor the right to close any school or schools in any particular school district whenever: (a) He determines there is actual or impending domestic violence endangering lives or property; (b) Federal troops are stationed in, on or about a public school; (c) He determines an efficient educational system cannot be maintained because of integration of the races in school. The Act also provides: In the event of a closing, an election shall be held within 30 days and if a majority so vote the school or schools shall be opened on an integrated basis; If any superintendent, or other employee of the school fails to cooperate in carrying out the closing order he or they will be replaced by the Governor until the next regular school election; Any schools so closed shall not be reopened except by the Governor; If any section or provision of the Act is held unconstitutional it will not affect the remaining portions; and: The provisions of the Act shall be activated by proclamation of the Governor. The emergency clause sets forth the reasons for the passage of the Act and its immediate effective date.
On September 12, 1958, the Governor, pursuant to the provisions of the above Act, ordered the Senior High Schools in the Little Rock School District closed as of September 15, 1958, at 8:00 o'clock a. m. The reasons given by the Governor for the closing order, as they are set out in his *878 proclamation, were: "I have determined that domestic violence within the Little Rock School District is impending, and that a general, suitable, and efficient educational system cannot be maintained in the Senior High Schools of the Little Rock School District because of integration of the races in such schools."
On the same day the proclamation was issued, appellant, as a citizen and taxpayer, filed a complaint against the Governor alleging that Act 4 violated the Constitution of the United States and the Constitution of Arkansas, and particularly Article 14 of the latter Constitution. The prayer was that, in event the schools were closed, a mandatory injunction issue against the Governor directing him to vacate and nullify the proclamation. The court was also asked to enter a declaratory judgment construing the constitutionality of Act 4.
To the above complaint demurrers were filed by the Attorney General and also by appellee's private attorneys on the ground that the complaint failed to state a cause of action. The private attorneys also denied that the trial court had jurisdiction of appellee or the subject matter, and the Attorney General joined appellant in requesting a declaratory judgment. The trial court sustained the demurrer filed by the Attorney General, and dismissed the complainthence this appeal.
The only ground relied on by appellant for a reversal is thus stated in her brief:
"Act 4 of the Extraordinary Special Session of the General Assembly of Arkansas for 1958, is unconstitutional in that it violates Article 14 of the Constitution of Arkansas. Hence any act of the Governor based upon Act 4 is void for lack of constitutional authority, same being in violation of said Article 14 of the State Constitution."
The brief filed by amicus curiae attorneys, however, assumes that Act 4 will be considered in relation to both the State and Federal Constitutions and it is our purpose to do so.
Does the Act Violate the State Constitution? In our opinion Act 4 does not necessarily violate the State Constitution. We use the word "necessarily" advisedly. It is a well-established principle of law that an Act of the Legislature which is constitutional on its face may become unconstitutional in its operation or under changed conditions. The landmark case announcing this principle is Yick Wo v. Hopkins, 118 U.S. 356, quoting from page 373, 6 S. Ct. 1064, page 1073, 30 L.Ed. 220:
"Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."
Essentially the same principle was announced by this court in Board of Trustees, University of Ark. v. Pulaski County, 315 S.W.2d 879, 882, in these words: "The principle is well settled that a statute may be valid when enacted but may become invalid by changes in the conditions to which it applies." In Taylor v. City of Pine Bluff, 226 Ark. 309, 289 S.W.2d 679, 680, we quoted with approval "that purposeful discrimination in the enforcement of an ostensibly fair law may violate the constitution. If the unlawful administration of the statute results `in its unequal application to those who are entitled to be treated alike,' there is a denial of equal protection." Since Act 4 is unquestionably an attempt to exercise the police powers of the State about which more will be said later, and since this case comes to us on a demurrer, and since acts of the Legislature are presumed to be constitutional, it is not incumbent on us to speculate on facts that might tend to invalidate this Act. In this connection, in the case of Harlow v. Ryland, D.C., 78 F.Supp. 488, 493, affirmed 8 Cir., 172 F.2d 784, the court, in considering the validity of a statute said: "* * * it is *879 not incumbent upon the court to find the actual existence of facts which would justify the legislation; but if a state of facts which would justify the legislation can reasonably be conceived to exist, the court must presume that it did exist and that the law was passed for that purpose."
The remaining question then is: Does Act 4, on its face, violate Section 1 of Article 14 of our State Constitution, as claimed by appellant? This section reads:
"Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction."
It is our conclusion that no such constitutional violation exists. Article 14, Section 4, of our Constitution reads: "The supervision of public schools and the execution of the laws regulating the same shall be vested in and confided to such officers as may be provided for by the General Assembly." Therefore, from a strictly constitutional standpoint, the Legislature had the same right to authorize the Governor to take charge of schools as it has always exercised to authorize school boards to do so. There is nothing in the Constitution requiring schools to be maintained in any fixed number at any fixed standard, or in any fixed places. If it did and if the requirements were those existing on September 27, 1958, then the Constitution has been flagrantly violated for more than 75 years following 1874.
We have read with much interest the case of Harrison v. Day, 106 S.E.2d 636, 637, 647, decided January 19th of this year, where the Supreme Court of Virginia held several segregation acts in conflict with the Constitution of that state. Section 129 of the Virginia Constitution, in language essentially the same as in Section 1, Article 14 of our Constitution, requires the State to maintain a system of free public schools. However, Section 133 of their Constitution places "The supervision of schools in each county and city * * * in a school board, to be composed of trustees * * *" etc. The court held that this provision prevented the Legislature from placing the supervision in the Governor. Of course no such restriction is found in our Constitution as we have already pointed out. It is interesting to point out that the Virginia Supreme Court, in considering an Act which permitted schools to be closed because of the presence of Federal Troops, had this to say: "* * While we agree that the State, under its police power, has the right under these conditions to direct the temporary closing of a school, the provision divesting the local authorities of their control and vesting such authority in the Governor runs counter to Section 133 of the Constitution."
We repeat that we find nothing in Act 4 which conflicts with Section 1, Article 14 of the Arkansas Constitution. The degree to which the police powers of the State may be extended will be further discussed later.
Regarding the United States Constitution. Technically speaking, the question posed for our solution is: Does Act 4 conflict with the first section of the 14th Amendment of the United States Constitution? This section, in substance, says: (a) All persons born or naturalized in the United States, and subject to its jurisdiction, are citizens; (b) No state shall make or enforce any law abridging the privileges or immunities of such citizen; (c) No state shall deprive such citizens of life, liberty, or property without due process of law, and: (d) No state shall deny such citizen equal protection of the laws. The Supreme Court of the United States in the case of Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 692, 98 L.Ed. 873 (on May 17, 1954) interpreted said section to forbid discrimination in the public schools. Ordinarily, it sseems, that should have ended the matter because the law had been declared, but it did not. The court must have realized that the dosage was too potent for immediate *880 administration, for it said: "* * * because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity" (our emphasis). For the above reason the court continued the matter for several months and gave all states permitting segregation an opportunity to be heard. After another hearing, the Court (349 U. S. 294, 75 S.Ct. 753, 755, 99 L.Ed 1083) on May 31, 1955, handed down its final decision. Apparently the Court still recognized the dosage was too potent to be taken at one time without harmful after effects. Among other things it said:
"These presentations were informative and helpful to the Court in its consideration of the complexities arising from the transition to a system of public education freed of racial discrimination. * * *"
"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems * * *."
"Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. * * *"
"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. * * *"
"These cases call for the exercise of these traditional attributes of equity power. * * *"
"To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. * * *"
"Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. * * *"
"Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. * * *" (Our emphasis.)
We have set out the above quotes because it appears that they delineate the only sphere of judicial discretion left to us. While we deeply deplore the fact that the Supreme Court of the United States did not follow the clear legal precedents announced in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, in Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L. Ed. 172, and in numerous other decisions over a period of fifty years, instead of a long list of non-legal authorities, yet this Court will be subservient to the decision it did reach unless and until relief is afforded by the United States Supreme Court itself, by amendment to the Federal Constitution, by the intervention of Congress under Section 5 of the said 14th Amendment, or by some other means not readily apparent. Much has been said about the supreme law of the land in connection with the issue before us now. While we can see no room for argument since Article 6 of the United States Constitution itself says it, together with laws passed by Congress and certain treaties, "shall be the supreme Law of the Land."
Our Field of Interpretation. Notwithstanding what we have said above concerning the supreme law of the land, we feel that the issue before us falls within a sphere which allows this court some judicial discretion. That sphere is the application of the police powers of the state to the implementation of the decision in the Brown case, supra.
First, let us make our position clear. If Act 4 is viewed as giving the Governor the power to close all public schools permanently, it would, we concede, be in violation not only of the decree in the Brown case but also of the State Constitution, but we *881 do not consider it that way. Without extending this opinion unduly by recounting all the history preceding and leading up to the passage of Act 4, we take it as well understood that the Act was intended to slow down the implementation of integration until it could be accomplished without great discomfort and danger to the people affected or until a lawful way could be devised to escape it entirely. In other words, the relief was intended to be temporary and not permanent. The terms of the Act itself bear out this interpretation.
There is nothing in the record to show what reasons the Governor had for believing that the peace would be disturbed or that the lives of citizens and property of the district would be endangered, and certainly there is nothing in the record to show his reasons were not well founded. Such being the case we will assume, as we have previously pointed out we may, that the Governor did not act capriciously.
If, in closing the schools temporarily, the Governor did so to protect the peace and welfare of the people, then he was justified, we think, under the well-recognized police powers of the State. We believe that if the legislature had given the Governor the power to close schools temporarily in case of pestilence or insurrection in order to protect the people, no question of constitutionality would or could be raised. The difference between the real and the supposed situation is not one of law but of fact and the only difference in fact is one of degree. While the decisions dealing with police power are legion, the fundamental concept underlying its principle is nowhere better stated than in 11 Am.Jur. under the title Constitutional Law. In Section 251 it is stated: "* * * the police power is expressed by the well-known maxim `solus populi est suprema lex' (The welfare of the people is the supreme law). It has been said that this maxim is the foundation principle of all civil government and that for ages it has been a ruling principle of jurisprudence." Also in the same text, Section 255, it is stated: "The police power under the American constitutional system has been left to the states." Numerou footnote cases are cited in the text to support both propositions.
It makes no difference, we think, whether threat of the welfare of the people arises out of a pestilence or out of certain concepts of life that had formed over a period of yearseven though these concepts may be based, as some insist, on prejudice or emotions. We believe it is common knowledge that people are most disturbed over emotional matters. The existence and extent of the emotional matters involved in the matter under discussion are too well known to need amplification.
Not only are the emotions and concepts mentioned above very real in the lives of the people of many sections of the nation, including this state, but we think they have been permitted and even encouraged by the same court that authored the Brown decision. A few exerpts from the opinions of the Supreme Court will suffice to explain. In the Gong Lum case, supra, where the court was dealing with the question of segregation, it said:
"* * * the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of federal authority with the management of such schools cannot be justified * * *." [275 U.S. 78, 48 S.Ct. 93.]
In Robinson v. Memphis & Charleston Ry. Co., 109 U.S. 3, 3 S.Ct. 18, 31, 27 L.Ed. 835, we find:
"* * * if the laws themselves make any unjust discrimination, amenable to the prohibitions of the fourteenth amendment, congress has full power to afford a remedy under that amendment and in accordance with it."
Much of the language used by the Court in the Plessy case, supra, must have been reassuring to the people for nearly fifty *882 years. Some expressions of the court are set out, viz.:
163 U.S. at page 544, 16 S.Ct. at page 1140: "The object of the amendment (14th amendment U.S.Const.) was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power * * *."
163 U.S. at page 550, 16 S.Ct. at page 1143: "So far, then, as a conflict with the (14th amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and with respect to this there must necessarily be a large discretion on the part of the legislature. In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort, and the preservation of the public peace and good order."
163 U.S. at page 551, 16 S.Ct. at page 1143: "The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the negro except by an enforced commingling of the two races. We cannot accept this proposition. If the two races are to meet upon terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits, and a voluntary consent of individuals."
The court in speaking of integration of the races said:
"* * * this end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate." (Emphasis supplied in each instance.)
In view of the overall situation as we have tried to point it out above, and having seen that the court itself in the Brown case recognized some consideration must be given to local conditions and customs in the implementation of its opinion, we are driven to the conclusion that there is, and by law and common sense should be, a large sphere of action available to the State Legislature, under its police power, to guide the course of segregation so as to protect the public welfare. As before intimated, we are aware that neither this Court nor the Legislature can over-ride permanently the integration mandate, but some one must guide a peaceable, safe course for its implementation. Under veto power of the Supreme Court of the United States, we believe this course can better be charted by those closest to the people affected and therefore better acquainted with local conditions. It is within this framework that we uphold the constitutionality of Act 4 under the police power of the State Legislature.
It is in this connection also that we desire to stress what our courts, including the Supreme Court of the United States, have heretofore said:
Barbier v. Connolly, 1885, 113 U.S. 27, 5 S.Ct. 357, 359, 28 L.Ed. 923:

*883 "But neither the amendment (14th) broad and comprehensive as it is nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity."
State v. Mountain Timber Co., 75 Wash. 581, 135 P. 645, 648, L.R.A.1917D, 10:
"Having in mind the sovereignty of the state, it would be folly to define the term. To define is to limit that which from the nature of things cannot be limited, but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The police power is to the public what the law of necessity is to the individual. It is comprehended in the maxim, Salus populi suprema lex. It is not a rule; it is an evolution."
State v. Hay, 126 N.C. 999, 35 S.E. 459, 460, 49 L.R.A. 588, 78 Am.St.Rep. 691:
"`Salus populi suprema lex,'`the public welfare is the highest law,'is the foundation principle of all civil government. * * * There is an implied assent on the part of every member of society that his own individual welfare shall, in cases of necessity, yield to that of the community; and that his property, liberty, and life shall, under certain circumstances, be placed in jeopardy, or even sacrificed, for the public good."
State v. Boone, 84 Ohio St. 346, 95 N.E. 924, 39 L.R.A.,N.S., 1015:
"The police power is inherent in sovereignty; and its exercise is justified by the necessity of the occasion. Its foundation is the right and duty of the government to provide for the common welfare of the governed. It is tersely expressed in the maxim, `Salus populi suprema lex'".
Davock v. Moore, 105 Mich. 120, 63 N.W. 424, 429, 28 L.R.A. 783:
"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and public morals. They belong emphatically to that class of objects which demand the application of the maxim, `Salus populi Suprema lex'; and they are to be attained and provided for by such appropriate means as the legislature may devise."
People v. Linde, 341 Ill. 269, 173 N.E. 361, 363, 72 A.L.R. 997:
"The power that the state may exercise in this regard is the overruling law of necessity and is founded upon the maxim, `Salus populi est suprema lex.' The existence and exercise of this power are an essential attribute of sovereignty, and the establishment of government presupposes that the individual citizen surrenders all rights the exercise of which would prove hurtful to the citizens generally."
Bland v. People, 32 Colo. 319, 76 P. 359, 361, 65 L.R.A. 424, 105 Am.St.Rep. 80:
"`The welfare of the people is the supreme law,' is a maxim of the law, and it is upon these two maxims that the police power of the state is largely based. In the exercise of the police power the Legislature has a large discretion, and it is our duty to sustain such legislation unless it is clearly and palpably and beyond all question in violation of the Constitution." (Emphasis supplied in each instance.)
*884 That complete integration of the schools in many communties presents a social problem fraught with frightening consequences in the minds of many people is a fact that cannot be ignored or avoided. If those people are convinced they are being forced into acceptance, without time for adjustment, by a few people who are far removed from the scene and who, they feel, are not sympathetic or understanding, the problem becomes more frightening. On the other hand, if these same people were given assurance that they would be guided by understanding and sympathetic local officials, it would tend to allay their fears and also would, no doubt, hasten the day when a complete solution would be achieved with a measure of dignity, peace and harmony. It is in this concept that we rely so heavily on the police power of the State to protect the peace and welfare of the people, and to effect a workable solution of this momentous problemall within the framework of the Brown opinion. It was to this end that Act 4 was passed by the Legislature and it is to this end that we hold it is constitutional.
In speaking of the deep and disturbing feelings of the affected people, we take judicial notice of numerous elections where the people have expressed their feelings in no uncertain terms, and also of the adoption of Amendment 44 to the State Constitution. Section 3 of that Amendment reads: "The General Assembly shall enact such laws under the Police Powers reserved to the States as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas." Other portions of the amendment make it clear that the Legislature was not only empowered but was directed to protect the safety and welfare of the people.
In view of what we have said it follows that the decree of the trial court must be, and it is hereby affirmed.
Affirmed.[*]
HARRIS, C. J., and ROBINSON, J., concur.
HOLT, McFADDIN and GEORGE ROSE SMITH, JJ., dissent.
HARRIS, Chief Justice (concurring).
The purpose of this concurrence is to state my own views relative to the Act here in question. My decision as to the validity of Act 4 is based purely and simply upon the State's police power. The right of the State to enact legislation as a means of protecting the health and safety of its citizens, is so well recognized as to really need no citation of authority, and this is true with reference to emergency legislation, though the legislative act may be in conflict with a constitutional provision. As stated in 16 C.J.S. Constitutional Law § 195, p. 945:
"Legislation may be enacted under the police power, in seasons of emergency, which would not be appropriate at other times, and such legislation is not invalid merely because it necessarily works a hardship on some individuals for a period of limited duration; but emergency does not justify destruction. Emergency legislation ordinarily contains a declaration that an emergency exists which is causing widespread distress to a large portion of the population with resulting danger to health, safety, or morals of the public generally, but the mere legislative declaration does not of itself create an emergency which will warrant the legislation. The actual existence of the emergency and not the limitation of the law's operation to a prescribed period, gives validity to an exercise of the police power, and, when the emergency ceases to exist, the operation of the statute will be arrested, even though the prescribed term of its operation may not then have expired."
This doctrine has been followed in any number of cases, one of the most celebrated *885 being Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, which case is cited in various decisions from state courts, including our own. The background is as follows. In 1933, this nation was in the throes of a terrible economic depression, and people who had mortgaged their homes, unable to pay the indebtedness for which the mortgages had been given, were losing their property through foreclosure proceedings. Various state legislatures enacted legislation designed to prohibit immediate foreclosures, and thus protect citizens from losing their homes. Among other states which enacted such legislation were Arkansas, Arizona, and Minnesota. The acts so passed by the General Assemblies of these states were attacked in the courts as unconstitutional, and Act 21 of the Arkansas General Assembly of 1933 was attacked on the ground that it was unconstitutional and void, because it conflicted with Section 17 of Article II of the Constitution of the State of Arkansas,[1] and further, the Act was in conflict with Section 10 of Article I of the Constitution of the United States, which provides that no state shall pass any law impairing the obligation of contracts. This Court passed upon these contentions in the case of Reiman v. Rawls, 188 Ark. 983, 68 S.W.2d 470, and in an opinion written by the late Mr. Justice Mehaffy, said:
"It is a matter of common knowledge that the present is a period of great depression and that land values have decreased until there is practically no market for such property. A home that was worth $2,500 when mortgaged to secure a debt some years ago would not bring at foreclosure sale more than one-fourth of this amount, and in many cases much less. There is not only no market for land, but practically all the banks in the country have failed, and it is impossible to borrow money secured by mortgage or pledge of property, to pay debts, and thousands of people in Arkansas who were making a living prior to the depression have lost their jobs, are without work, and without means of support. Governments are created for the purpose of securing the rights of the citizens, and, if a government during a period of such depression as we now have could not protect its citizens, there would be no reason for its existence."
The opinion then quoted from the opinion of the Minnesota Supreme Court in the Blaisdell case [189 Minn. 422, 249 N.W. 334, 86 A.L.R. 1507] (which subsequently went to the United States Supreme Court) as follows:
"Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war, * * * earthquake, pestilence, famine, and fire, a combination of men or the force of circumstances may, as the alternative of confusion or chaos,[2] demand the enactment of laws that would be thought arbitrary under normal conditions."
Under the view expressed therein, Act 21 was upheld as valid legislation. See also Sewer Improvement District No. 1 of Wynne v. Delinquent Lands, 188 Ark. 738, 68 S.W.2d 80. In the case of Pouquette v. O'Brien, 55 Ariz. 248, 100 P.2d 979, the same question was before the court in 1937. In this case, the court refused to grant relief, because it said the emergency no longer existed, and held that the mortgage moratorium acts of 1937 and 1939 were unconstitutional as being in conflict with Section 10, Article I of the Federal Constitution. However, the court, in its language, cleary indicated that the legislation *886 would have been upheld in 1933, and in a rather lengthy opinion, discussed the Blaisdell case. Inasmuch as the latter is a very lengthy opinion (consisting, with headnotes, of nearly 51 pages), and the reasoning is summarized quite well in the Pouquette case, I quote from the latter in explaining the reasoning of the United States Supreme Court in the former.
"The case is a long one and quotations therefrom sufficient to fully explain and substantiate our conclusions as to its meaning would extend this opinion to unreasonable length. After a careful analysis of the case and its reasoning, we think it clearly laid down the following principles: (a) Legislation of the kind involved in the various mortgage moratorium acts under consideration unquestionably violates section 10, Art. I of the Federal Constitution referred to. (b) There is implied, though not expressed, within the Federal Constitution a reservation of the police power to the states, which is superior to all specific provisions of that constitution and which may be called into play in periods of great public emergency, and when so called these police powers may temporarily only suspend the exercise of the specific powers or prohibitions of the constitution. As was stated in the Blaisdell case: `Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be contrued to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions * * *.' The existence of a public emergency justifying the suspension of the ordinary constitutional limitations is primarily for the legislature, but the determination of that branch of the government is not conclusive, and whether a law depending upon the existence of an emergency ceases to operate because the emergency had ceased is always open to judicial inquiry, notwithstanding the legislative declarations. Again and again through the opinion the court emphasizes the fact in varying language that in order to justify legislation like the mortgage moratorium acts there must exist a grave public emergency in the opinion of both the legislative and judicial branches of the government, and that when, in the opinion of the latter, the emergency which justifies the act has passed, of necessity the moratorium ceases to be effective, or, as it may be more emphatically put, becomes unconstitutional so far as future use is concerned." [55 Ariz. 248, 100 P.2d 981.]
The Minnesota Act was held valid in an opinion written by one of our greatest jurists, the late Chief Justice Charles Evans Hughes, in which the Court held that the emergency legislation was within the reserved power of the state to protect the vital interests of the community, did not violate the contract clause, the due process clause or the equal protection clause of the Federal Constitution, and the Chief Justice commented that a review of the court's decisions showed "a growing appreciation of public needs and of the necessity of finding ground for a rational *887 compromise between individual rights and public welfare." [290 U.S. 398, 54 S.Ct. 241.] The opinion cited numerous United States Supreme Court decisions in support thereof.
It would therefore seem to me that the only question is whether the situation that existed in Little Rock in September, 1958, was sufficiently inimical to the public safety and welfare to justify the legislation here involved. In reaching a conclusion as to this matter, the Court will, of course, take judicial note of the conditions that existed at Central High School during the '57-'58 school year. In commenting upon this situation, I do not primarily refer to the chaotic conditions existing outside the building, i. e., the crowds that had gathered in protest. I mainly have reference to those conditions that existed inside the school, and which were a daily part of student life. Let it first be said, that as far as I know, this is the first time in the history of this nation that troops have patrolled the halls or corridors of a school. I have divers times deliberated as to just how much education a teen-age boy or girl could acquire under such circumstances, and in addition, the frequent threat of bombings, and the systematic search through the lockers and other school property for possible bombs. Conditions could not have been more abnormal, and I am persuaded that the average student could not but be adversely affected by such tense and unusual conditions.
With reference to the Governor's proclamation closing the schools, wherein it is stated "Domestic violence within the Little Rock School District is impending * * * ", the attorney who filed with this Court a very fine amicus curiae brief, stated: "There is no proof whatever in the record to sustain this determination." I do not agree. No better criterion could be found than what had already happened. The very fact that the Federal Government deemed it necessary to place troops within the school, speaks louder than a thousand words. I need no better evidence than that the Federal authorities themselves recognized such an emergency as had not heretofore existed, else the troops would not have been sent, or would have been withdrawn once the crowds had melted away. To the contrary, such troops remained for the full school term of nine months, clear through graduation. However, this was not the end. At the time school was due to reopen, the Government sent in from over the country, various United States Marshals, and recruited and trained several dozen Special Deputy Marshals to apparently perform the same duties that had previously been performed by the military. There, of course, was no occasion to recruit this force unless its use was contemplated. As stated in 16 C.J.S. Constitutional Law § 185:
"In the exercise of the police power legislatures may enact all laws necessary for the preservation of the rights of person and property from unlawful violence and disorder and the maintenance of good order throughout the state. Threatened disorders are equally subject to the police power as are actual disturbances of the public peace."[3]
I cannot even remotely understand, nor comprehend, how any individual could contend that conditions were not such as required the use of the State's police power for the purpose of maintaining peace, good order, and the safety of the students of the senior high schools of Little Rock; in fact, I do not consider it necessary that the situation reach the proportions, or magnitude, herein pointed out, before such legislation would be justified.
This Court has previously, even without the conditions herein cited, given the Legislature great leeway in controlling the subject of education. For instance, in Krause v. Thompson, 138 Ark. 571, 211 S. W. 925, the validity of a statute was questioned which provided for the consolidation *888 of three school districts, and further provided:
"Until such time as the patrons of Pittsburg School District No. 41 and Oakland Special School District No. 19, which are hereby annexed to Lamar Special School District No. 39, shall by a majority petition request their discontinuance, public schools shall be taught in each for a period not exceeding seven months during each year at the places where schools have heretofore been taught and during such seasons as the patrons or a majority thereof may desire, and * * * teachers shall be employed upon the recommendation of a majority of the patrons of each school and shall be paid the same salary as teachers in the public schools of Lamar are paid for like or similar services, * * *."
This Court, in an opinion by the late Chief Justice McCulloch, said:
"The statute is assailed in the first place on the ground that it violates section 1, article 14 of the Constitution which pledges the State to `maintain a general, suitable and efficient system of free schools, whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction.' If this section applies at all to the arrangement and management of school districts, it certainly does not hamper the Legislature in its control over that subject. We have frequently held that the legislative control over the organization of school districts and changes therein is supreme."
Several cases substantiating this statement are then cited.
It is asserted by counsel in the amicus curiae brief, that Act 4 was not emergency legislation, and the fact that an election is called for, which would be determinative of whether the schools should be re-opened, is proof of that fact. May it simply be said that I consider subsection (b) of Section 1 (which calls for the election), to be mere surplusage. It adds nothing to the power given the Governor to close a school, and that authority is fully effective without the provision, or the subsequent provisions relating to the election. The gravamen of the attack on Act 4 is the authority given the Governor to close schoolsnot those provisions relating to the re-opening of same.[4] A discussion, therefore, of the validity of those sections is unnecessary to a determination of the issue before us.
I feel that much could be added in support of the position herein taken, but to say more would only unduly prolong the opinion. This case has given me considerable concern, because of my deep-seated belief in public education. Perhaps that belief is, to some extent, predicated upon, and influenced by, the knowledge that except for our public school system, I should probably have found it most difficult to obtain an. adequate elementary or secondary school education. I am convinced that the same is true with reference to thousands of my fellow citizens. It has thus been personally difficult for me to reach this decision, but
*891 I always come back to the same thought, viz., that education, under the conditions heretofore enumerated, cannot, even under the most elastic and flexible construction of the words, be considered "suitable" or "efficient" as provided by Article 14, Section 1 of our Constitution. The enthusiasm and energy of youth, which is used to such good advantage for the acquirement of knowledge in happy surroundings, may well be stifled in an evironment of fear and restraint.
To sum up and concisely state my views, the Legislature could not, in the face of the provisions of the State Constitution,[5] enact legislation abolishing the public school system, nor validly pass legislation closing permanently part of the schools.[6] But, as herein pointed out, the law is well established that constitutional provisions may be suspended during periods of great emergency, and this principle applies to the requirements of both the Federal and State Constitutions. The United States Supreme Court, in the Blaisdell case, held that Section 10, Article 1, of the Federal Constitution was violated by the mortgage moratorium act, there under attack, but nonetheless held such legislation valid because of the severe economic depression. In the litigation before us, we are not dealing with an economic crisisnor with financial lossesbut, to the contrary, with an emergency far more importantthe health, safety and welfare of hundreds of our young people. Can any court logically say (as has been said by the United States Court and this Court) that a suspension of constitutional requirements is right and proper when economy is affectedbut not right and proper when the physical and mental well-being of our citizens is at stake? To ask the question is but to answer it.
It is impossible to say for what period of time emergency legislation can remain in effect. The Minnesota Act provided that its provisions should become inoperative a little more than two years after it was approved. The Arizona Court held that the emergency was over some four years after the passage of the original act, though it might possibly have held such legislation invalid earlier, had same been tested. I can only say that when conditions become sufficiently normal that a student can pursue his quest for learning in surroundings conducive to samethen the need for the extraordinary powers herein granted, will have ceased. Until that time, I am forced to conclude that the pertinent provisions of Act 4 are valid and lawful. I fervently hope that time will soon arrive, and I am convinced that a more sympathetic and realistic approach to the problems (engendered by the Brown decision) by the appropriate Federal authorities, will hasten that day.
ROBINSON, Justice.
I concur for the purpose of setting out in detail the reasons for my conviction that Act No. 4 of the Extraordinary Session of the General Assembly for the State of Arkansas for 1957 violates neither the Constitution of Arkansas nor the Constitution of the United States.
The first question is whether Act No. 4 violates Article 14 of the Constitution of Arkansas of 1874, copied from the Constitution of 1868, providing that the State must maintain free public schools. Does this provision of the Constitution mean that in *890 any and all circumstances free public schools must be maintained? Does this provision of the Constitution mean that the State of Arkansas must maintain integrated schools? We know from the history of the times and particularly of the year 1874, when the present Constitution of Arkansas was adopted, that it was not the intention of the people to compel the State to support integrated schools. The meaning of constitutional guaranties never varies. Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303.
No one will deny that prior to 1874 there had been no integration of the races, in schools or otherwise, in the State of Arkansas. As shedding some light on the subject, the Arkansas Constitutional Convention of 1868, although composed to a large extent of people unfriendly to the customs and traditions of the people of this State, went on record as being opposed to any amalgamation of the races. Notwithstanding that those who appear to have been in control of the 1868 Constitutional Convention, as shown by the debates and proceedings of the Convention, were lately from Ohio, Canada, New Jersey, Iowa, Pennsylvania, Indiana, New York, Illinois, Scotland, the District of Columbia, England, and other states, and even though there was warm discussion in the Convention as to whether the Constitution of 1868 should contain a provision prohibiting marriages between the races, there is no indication whatever that any member of the Convention thought there should be integrated public schools.
The Convention, on February 5, 1868, adopted a resolution as follows: "Resolved: That this Convention is utterly opposed to all amalgamation between the white and colored races, whether the same is legitimate or illegitimate. We would, therefore, recommend that the next General Assembly enact such laws as may effectually govern the same." By amalgamation the resolution has some meaning other than intermarriage between the races, because there was already in force and effect, and had been since February, 1838, a statute which is still in force and effect and which provides: "All marriages of white persons with negroes or mulattoes are declared to be illegal and void." Rev.Stat, Ch. 94, § 4.
In 1895, in the case of Dodson v. State, 61 Ark. 57, 31 S.W. 977, the validity of the intermarriage statute was challenged on the ground that it had been repealed by implication by the Constitutions of 1864, 1868 and 1874 and the Fourteenth Amendment to the Constitution of the United States. The contention of unconstitutionality of the statute was based on the equal rights and privileges of citizenship and that the making of contracts is one of the rights and privileges of a citizen, and that a marriage being in the eyes of the law only a civil contract, the right and privilege of entering into such contract could not be lawfully abridged. In refusing to follow this reasoning, Chief Justice Bunn, writing the opinion of the Court, said: "It is not true that marriage is only a civil contract. It is more than that. It is a social and domestic relation, subject to the exercise of the highest governmental power of the sovereign state,the police power. * * * Nor does the continued existence of the prohibitory act depend on the rather uncertain foundation that its repeal cannot be asserted because, although in spirit repealed, yet, since this is only by implication, it must stand. The act is on a more solid foundation than that. If repealed in the way contended for, it involves a surrender by the people of one of the attributes of sovereignty. That cannot be attributed to the people, unless made by express declaration, if at all." The validity of the statute prohibiting intermarriages by members of the Negro and White races was upheld.
Maintenance of schools by the State means something more than teaching "the three R's". It forces a social status on the children. The manner of the operation of public schools necessarily compels social contacts by the students. There are many extracurricular activities involving social contacts that are necessary functions of *891 schools, such as dramatics, where the students are subject to very close social contacts, athletics, school cafeterias, dances, P.T.A. meetings, and other social activities in which the students are more or less compelled to participate.
It has always been the practice in this State to maintain separate schools for White and Negro students, and so far as we have been able to ascertain, this is the first time it has ever been contended in any state court that our Constitution compels the State to maintain integrated schools. This is the first time this Court has been called upon to say whether such construction should be placed on the Constitution. The federal courts, however, have heretofore had occasion to construe our Constitution, Article 14, and Ark.Stat. § 80-509, dealing with public schools. It was held, in Pitts v. Board of Trustees of De Witt Special School Dist., D.C., 84 F.Supp. 975, that our statute, § 80-509, providing for separate schools for White and Colored persons, is not contrary to Article 14 of the Constitution of Arkansas.
Not only do we have segregated public schools, but we have separate industrial schools for Negro boys and White boys, and a Negro girls' training school, and a like school for White girls; and other public institutions in the State are segregated, such as the blind schools, the schools for the deaf, the State penitentiary and the State tuberculosis sanitariums.
Long acquiescence of policy pursued in every county in the State, and acts of the Legislature on the subject, are not without compelling force in reaching a conclusion as to the intention of the people when the Constitution was adopted. Laurel Hill Cemetery v. City and County of San Francisco, 216 U.S. 358, 30 S.Ct. 301, 54 L.Ed. 515. The Constitution belongs to the people. They can do what they like with itthey can amend it, they can repeal it, and they can construe it. Here the Court has the rare benefit of the constitutional provision under consideration having been construed by the people. The people have a right to say what the Constitution means, and in no uncertain terms, by means of Amendment No. 44, initiated and adopted by the people in 1957, and by the 1957 resolution adopted by the people, they have clearly shown that no provision of the Constitution of this State means that the State must maintain integrated schools. Amendment No. 44 and the Interposition Resolution of 1957 are set out in full as an appendix to this concurring opinion. Especially pertinent parts of the Amendment and the Resolution are as follows:
Amendment No. 44 provides:
"§ 1. Action by general assembly to protect states' rights.From and after the Adoption of this Amendment, the General Assembly of the State of Arkansas shall take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court, * * *

* * * * * *
"§ 3. Regulation of health, morals, education, marriage and good order.The General Assembly shall enact such laws under the Police Powers reserved to the States as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas.

* * * * * *
"§ 5. All parts of the Constitution of the State of Arkansas in conflict with this Amendment be, and the same are, hereby repealed."
The Interposition Resolution provides:
"The People of Arkansas assert that the power to operate public schools in the State on a racially separate but substantially equal basis was granted by the people of Arkansas to the government of the State of Arkansas; * * *

* * * * * *
"The legislative executive and judicial powers of the United States as granted *892 under the Constitution shall not be construed to extend to the regulation of the public schools of any State nor to include a prohibition to any State, in the exercise of its power, to provide by its laws for the establishment, operation and maintenance of racially separate but substantially equal public schools within such State."
Amendment No. 44 is just as much a part of the Constitution as if it had been a part thereof from the first. I don't see how anyone can read it and the Resolution of Interposition adopted by the people and then say that under the Constitution of Arkansas this State must provide and support integrated schools. In my opinion such construction by the Court would be judicial usurpation of unauthorized power.
The next question is whether Act No. 4 violates the Constitution of the United States or the amendments thereto. By its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and the other cases decided simultaneously therewith, the Supreme Court of the United States did not intend to abolish the police powers of the State. In the Brown case and others decided at that time, the Court was dealing with facts in those cases, which were entirely different from the facts presented in the case at bar. The courts may take judicial knowledge of certain things that transpired in connection with the attempt to integrate a Little Rock public school. In Rice v. Shook, 27 Ark. 137, this Court said: "The Court will judicially notice that, at the date of the note, Little Rock and a large part of the State were and had been, for some considerable time previously, in possession of the forces of the United States."
An attempt to integrate a school in Little Rock brought about intolerable conditions. When the attempt was made to integrate one school by sending nine Negro students to a White school there was such a violent reaction on the part of the people that it was deemed necessary by the President of the United States to muster into federal service the Arkansas National Guard to reinforce a division of crack first-line United States troops, fully armed, sent to Little Rock to restore and maintain order. The troops were stationed at the schools, in the buildings and on the grounds, and armed soldiers patrolled the streets. The soldiers kept order for months, at a cost to the people of about $5 million.
At the end of the semester during which the Negro students were kept in the White school, in the spring of 1958, it was thought there would be another effort to integrate the schools in the fall, and in anticipation of the violence that placing the Negro students in the White school would engender, dozens of men were sworn in as Deputy United States Marshals, and also Deputy United States Marshals from other districts were sent to Little Rock, and all of them were given special training to cope with the violence that it was thought would occur when another effort was made to send Negro students to the White school. Nearly $400,000 of the people's money was spent in getting the Special United States Marshals ready to handle the anticipated violence. It is not known whether they were to work in connection with the troops or as a separate unit.
In the meantime, the State of Arkansas was taking measures to deal with the situation and prevent bloodshed, and a special session of the Legislature passed Act No. 4, now under consideration. In order to prevent violence that would be brought about by sending the Negro children to White schools, and to prevent the use of armed troops in the school buildings and on the school grounds, the Legislature authorized the Governor to close the school affected. But, undoubtedly, the General Assembly felt that if a majority of the voters, including Negro voters (who constitute a large percentage of the total electors in Little Rock), felt that the schools should be opened, then the schools could be conducted without the use of troops *893 and United States Marshals. Act No. 4, therefore, provides for an election to determine if the people wanted the schools opened. Such an election was held, and the vote was overwhelming in favor of keeping the schools closed.
Now, the question is whether in the existing situation Act No. 4 is valid under the police powers of the State. If the State cannot close schools under conditions we know existed in Little Rock when an attempt was made to integrate a school, then neither can the State close the schools when any other dangerous condition exists, and the police power, one of the few rights left to the States, is gone, perhaps forever.
The Virginia case of Harrison v. Day, 106 S.E.2d 636, 637, 639, is no precedent for the case at bar. In the Virginia case it is clearly stated: "It will be observed that the stated purpose of the plan embodied in these acts is to prevent the enrollment and instruction of white and colored children in the same public schools." Our Act No. 4 is clearly for the purpose of preventing violence and bloodshed. If there had been no violence and no bloodshed and no use of United States troops in connection with the operation of the Central High School in Little Rock, obviously Act No. 4 would never have been adopted. The assertion that the adoption of Act No. 4 was for the purpose of preventing racial integration of the schools under any circumstances is completely refuted by the fact that the University of Arkansas was integrated a long time before the decision in the Brown case. Such integration was not compelled by any court. There has been integration of other schools, such as the ones at Hoxie, Van Buren, Fayetteville, and perhaps others, but the schools were not closed by the Governor under authority of Act No. 4 because it was not necessary. There was no violence at those places. Act No. 4 grew out of the violence and use of troops and it was adopted to prevent such an occurrence in the future. If the State cannot use its police powers to prevent violence and bloodshed and when conditions are chaotic, thereby making necessary the use of United States troops and the National Guard to restore and maintain order among the people, then the State has no police power.
Without attempting to go into a long dissertation on the police power of the States and its scope, I merely quote from what the United States Supreme Court and other authorities have said on the subject: "It has repeatedly been held that no provisions of the Federal Constitution and none of the amendments added to that instrument were intended or designed to interfere with the police power of the various states." 11 Am.Jur. 986. "In accordance with the settled principle that no part of the Federal Constitution was intended to hamper a valid exercise of state police regulation, it is particularly established by overwhelming authority that the Fourteenth Amendment was not designed to interfere with, and does not interfere with, curtail, restrain, destroy, or take from the states the right duly and properly to exercise the police power. Furthermore, this amendment does not limit the subjects upon which the police power of a state may be exerted." 11 Am.Jur. 995-997.
In a letter to Mr. Duff Green, President Lincoln said: "The maintenance inviolate of the rights of the states, and especially the right of each state, to order and control its own domestic institutions, according to its own judgment, exclusively, is essential to the balance of powers upon which the perfection and endurance of our political fabric depend."
"It is settled by repeated decisions of this Court that the equal protection clause does not take from a State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary." Whitney v. People of State of California, 274 U.S. 357, *894 47 S.Ct. 641, 646, 71 L.Ed. 1095. "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State. * * * Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals. The legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to the class of objects which demand the application of the maxim, solus populi suprcma lex [Let the welfare of the people be the supreme law]; and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself. Boyd v. [State of] Alabama, 94 U.S. 645 [24 L.Ed. 302]." Beer Co. v. Massachusetts, 97 U.S. 25, 24 L.Ed. 989.
"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." Mugler v. State of Kansas, 123 U.S. 623, 660, 8 S.Ct. 273, 296, 31 L.Ed. 205. In that case the Court further said: "No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare. This conclusion is unavoidable, unless the Fourteenth Amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in Barbier v. Connolly, 113 U.S. 27, 31, 5 S.Ct. 357, 28 L.Ed. 923, that the Fourteenth Amendment had no such effect. After observing, among other things, that that Amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: `But neither the Amendmentbroad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the state, sometimes termed "its police power", to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity.'" [Italics ours]
Cases without number could be cited to the same effect. But it might appear to be an act of supererogation to cite here the innumerable cases wherein the Supreme Court of the United States has held that the police power of the States was not impaired by the Fourteenth or any other amendment. In Otis v. Parker, 187 U.S. 606, 608, 23 S.Ct. 168, 170, 47 L.Ed. 323, Mr. Justice Holmes said: "While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable *895 latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all Englishspeaking communities, would become the partisan of a particular set of ethical or economical opinions, which by no means are held semper ubique et ab omnibus [always, everywhere and by all]. Even if the provision before us should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deep-seated conviction on the part of the people concerned as to what that policy required. Such a deep-seated conviction is entitled to great respect." [Italics ours.]
No one contends that the people of Arkansas do not have the right to abolish the entire public school system if they so desire. Certainly under its police power the State has the authority to close a school to prevent violence and bloodshed and where, if the school were maintained, the teachers and students would have to take orders from soldiers with fixed bayonets, and Deputy United States Marshals.

Appendix

Amendment No. 44
"§ 1. Action by general assembly to protect states' rights.From and after the adoption of this Amendment, the General Assembly of the State of Arkansas shall take appropriate action and pass laws opposing in every Constitutional manner the Un-Constitutional desegregation decisions of May 17, 1954 and May 31, 1955 of the United States Supreme Court, including interposing the sovereignty of the State of Arkansas to the end of nullification of these and all deliberate, palpable and dangerous invasions of or encroachments upon rights and powers not delegated to the United States nor prohibited to the States by the Constitution of the United States and Amendments thereto, and those rights and powers reserved to the States and to the People thereof by any department, commission, officer, or employee of such department or commission of the Government of the United States, or of any government of any Nation or Federation of Nations acting upon the apparent authority granted them by or assumed by them from the Government of the United States. Said opposition shall continue steadfast until such time as such Un-Constitutional invasions or encroachments shall have been abated or shall have been rectified, or the same shall be transformed into an Amendment to the Constitution of the United States and adopted by action of threefourths of the States as provided therein.
"§ 2. Statutes for administration and enforcement of amendmentAppropriations. The General Assembly shall enact laws to insure the administration and enforcement of the spirit and letter of this Amendment ; and shall appropriate adequate funds to effect the same, including a proportionate share of such expenses as may be necessary for the maintenance of regional committees created among the States for the preservation of rights belonging to the states and the people thereof.
"§ 3. Regulation of health, morals, education, marriage and good order.The General Assembly shall enact such laws under the Police Powers reserved to the States as may be necessary to regulate health, morals, education, marriage, good order and to insure the domestic tranquility of the citizens of the State of Arkansas.
"§ 4. Public officers and employees No immunity for violation of laws enacted under amendmentForfeiture of office for violations.No public official or employee of the State of Arkansas or of any political subdivision thereof shall have immunity from arrest, prosecution and trial for the violation of such penal laws as the General Assembly shall provide for the willful *896 failure and refusal to carry out the clear mandates of this Amendment; and in addition to the penalties provided for by the General Assembly, shall automatically forfeit his or her office.
"Repealing Clause. Section 5 of Amendment No. 44, read: `All parts of the Constitution of the State of Arkansas in conflict with this Amendment be, and the same are, hereby repealed.'"

Arkansas Resolution of Interposition
"Be It Resolved And Enacted By The People Of The State Of Arkansas:
"The people of the State of Arkansas express their firm resolution to maintain and defend the Constitution of the United States and the Constitution of the State of Arkansas against every attempt, whether foreign or domestic, to weaken or destroy the structure of the State and federal governments.
"The People of Arkansas will ever defend and maintain the fundamental principle of our basic laws by which certain powers were delegated by the people of the separate states to the governments of the separate states while other specifically enumerated powers, not delegated to the separate states or reserved to the people, were delegated to the federal government. The State has never delegated to the Supreme Court of the United States the power to change the Constitution of the United States.
"The People of Arkansas assert that the maintenance inviolate of the rights of the States, and especially the right of each State to order and control its own domestic institutions according to its own judgment exclusively, is essential to that balance of power on which the perfection and endurance of our political faith depends.
"The People of Arkansas assert that the power to operate public schools in the State on a racially separate but substantially equal basis was granted by the people of Arkansas to the government of the State of Arkansas; and that, by ratification of the Fourteenth Amendment, neither the State of Arkansas nor its people delegated to the federal government, expressly or by implication, the power to regulate or control the operation of the domestic institutions of Arkansas; and any and all decisions of the federal courts or any other department of the federal government to the contrary notwithstanding.
"Therefore, The People of Arkansas, By Popular Vote:
"1. Respectfully appeal to all the people of the United States and to the governments of all the separate states and request them to join the people of Arkansas in taking steps, pursuant to Article V of the Constitution of the United States, by which the Constitution of the United States be amended so as to contain a provision substantially as follows:
"`The legislative executive and judicial powers of the United States as granted under the Constitution shall not be construed to extend to the regulation of the public schools of any State nor to include a prohibition to any State, in the exercise of its power, to provide by its laws for the establishment, operation and maintenance of racially separate but substantially equal public schools within such State.'
"2. Pledge our firm intention to take all appropriate measures, honorably and legally available to us, to resist any and all illegal encroachments upon the powers reserved to the State of Arkansas to order and control its own domestic institutions according to its own exclusive judgment.
"3. Urge upon the separate States and the people thereof their prompt and deliberate efforts to prohibit any further encroachments by the federal government upon the powers reserved to the separate states and the people thereof."
McFADDIN, Justice (dissenting).
On May 17, 1954 the United States Supreme Court delivered its first decision in *897 Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, which was most unfortunate, and which many believe to be entirely unconstitutional.[1] That decision upset social conditions that had existed in the South from the beginning of the American Union: it decreed racial integration in the public schools. Immediately after that decision, there began in the Southern Statesof which Arkansas is proud to be a parta determined and never-to-be-ended campaign to prevent racial integration in the public schools. One of the measures adopted by the Arkansas Legislature to prevent such racial integration was Act No. 4 of the Second Extraordinary Session of 1958; and that Act (hereinafter called "Act No. 4") is the only legislation now before us on this appeal.
The present suit was filed in the Pulaski Chancery Court by Mrs. Garrett (appellant here) against Orval E. Faubus (appellee here), as Governor of Arkansas, seeking to have Act No. 4 declared unconstitutional as violating Article 14 of the Arkansas Constitution, and also as violative of the Federal Constitution. When a demurrer was sustained and the complaint dismissed, this appeal ensued. The appellant here argues only one point: that Act No. 4 is violative of Article 14 of the State Constitution.[2] In the amicus curiae brief it is urged that Act No. 4 violates not only Article 14 of the Arkansas Constitution, but also Article 2, Section 18 of the Arkansas Constitution, and also the Fourteenth Amendment to the Federal Constitution. Counsel for appellee joins issue with the amicus curiae brief on all points; and also urges most strenuously that Act No. 4 is within the police power of the State. I never reach any Federal question. My views are these: (1) the Act No. 4 violates Section 1 of Art. 14 of the Arkansas Constitution; and (2) the claim of "police power" cannot prevent the invalidity of Act No. 4. Now I will elucidate.
I. Act No. 4. The Act is captioned: "An Act to Provide the Procedure Under Which the Governor May Order to be Closed the Schools of any School District; and For Other Purposes". The Act provides in Section 1 that the Governor may, by Proclamation, order any school, or all schools, of a District to be closed immediately and call a Special Election to be held in the School District within thirty days thereafter, whenever, inter alia:
"(b) integration of the races in any school, or all schools, of the school district has been decreed by an order of any court, and pursuant to the enforcement thereof, the President, or other officer of the United States Government, whether of the executive, legislative, *898 or judicial branch, causes troops, whether regular troops or the federalized National Guard, United State Marshals, or other force at the federal level, to be stationed in, on or about any such public school; or
"(c) he shall determine that a general, suitable, and efficient educational system cannot be maintained in any school district because of the integration of the races in any school within that district."
The Act No. 4 also provides in Section 2: that when a school has been closed by the Governor in accordance with Section 1 of the Act, then there shall be an electionopen to all qualified electors of the school districtand the voting shall be for or against racial integration of all of the schools within the school district; that if a majority vote for racial integration, then the schools shall be opened; "* * * otherwise, no school within the district shall be integrated". Section 4 of the Act says: "Any school closed by executive order authorized by this Act shall remain closed until such executive order is countermanded by Proclamation of the Governor filed with the Secretary of State and the Board of Directors of the School District."
Thus it is clear that whether there will be a school in operation in a district depends on: (1) whether the Governor closes the school and calls an election; (2) how the majority votes on the integration issue; and (3) when the Governor issues a Proclamation for reopening of the schools.[3] Stated another way, Act No. 4 makes the continued maintenance of the schools in any school district dependent on: (a) attempted integration; (b) Proclamation of the Governor; and (c) vote of the electors in the school district on the issue of integration.
II. The Arkansas Constitution. Now, let us see how Act No. 4 measures up to Section 1 of Art. 14 of the Arkansas Constitution, which reads:
"Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction."
Note the words: "* * * the State shall ever maintain a general * * * system of free schools * * *." We have many cases decided by this Court construing and applying this section of the Constitution. Some are: Maddox v. Neal, 45 Ark. 121; Dickinson v. Edmondson, 120 Ark. 80, 178 S.W. 930, Ann.Cas.1917C 913; Krause v. Thompson, 138 Ark. 571, 211 S.W. 925; Special School Dist. No. 65 of Logan County v. Banks, 144 Ark. 34, 221 S.W. 1060; and Dowell v. School Dist., 220 Ark. 828, 250 S.W.2d 127. In Maddox v. Neal, supra, Chief Justice Cockrill said: "Without schools there could be no school system, and the directors cannot dispense with the system. * * * It is the clear intention of the Constitution and statutes alike, to place the means of education within the reach of every youth. Education at public expense has thus become a legal right extended by the laws to all the people alike. * * * The opportunity of instruction in the public schools, given by the statute to all the youths of the State, is in obedience, as *899 we have seen, to the special command of the Constitution. * * *"
In Dickinson v. Edmondson, supra, Chief Justice McCullouch said: "No one can doubt that those who framed this provision had in mind that schools were to be conducted during each year * * *. The command of the Constitution is to provide by general laws `for support of common schools,' and that necessarily meant to maintain a system of free schools as complete as can be and continuous in its operations. * * * The establishment of high schools is within the limits of common school education because it merely raises the standard of popular education. High schools are `free schools' within the meaning of the Constitution * * *." [120 Ark. 80, 178 S.W. 932.]
In Krause v. Thompson, supra, Chief Justice McCullouch said: "School facilities must, of course, be afforded where taxation for maintenance of the schools is imposed * * *." [138 Ark. 571, 211 S.W. 926.] In Special School Dist. No. 65 of Logan County v. Banks, supra, the Legislature had passed a law permitting a Special School District in Logan County to charge tuition; and the Act was held unconstitutional by this Court as being in conflict with Art. 14 § 1 of the Constitution which guarantees that instruction be "gratuitous". Mr. Justice Hart said:
"As we have already seen, under the plain mandate of our Constitution above quoted and referred to, the gratuitous instruction of all persons in the school district between the ages of six and 21 years is guaranteed in the public schools. The terms "public schools' or `common schools' are used in our Constitution to denote that such schools are open to all persons within the approved ages rather than to indicate the grade of a school, or what may or may not be taught therein." [144 Ark. 34, 221 S.W. 1060.]
A further review of opinions involving Section 1 of Art. 14 of the Arkansas Constitution is unnecessary. The rationale of our holdings is that the constitutional language means what it says, and that the State "* * * shall ever maintain a general * * * system of free schools whereby all persons * * * between the ages of six and twenty-one * * * may receive * * * instruction. * * *" That is the constitutional mandate that the People of Arkansas gave to the Legislature and the officials of this State. "To maintain" a high school means to keep it open and operating:[4] that is what the Constitution says; and tax money is being collected in every school district in Arkansas to maintain the schools. "It is not the form, but the operation and effect, which determines the constitutionality of a statute." Webb v. Adams, 180 Ark. 713, 23 S.W.2d 617, 621.
As heretofore shown, Act No. 4 allows the schools to be closed indefinitely as long as the threat of racial integration exists, and allows a vote to be takenon a local option basisto determine when and under what conditions the schools shall be reopened. Art. 14 of the Arkansas Constitution gives no such power to the Governor, or any other person, to close the schools. Neither does the Constitution provide for local option to defeat the schools. So I maintain that Act No. 4 violates Section 1 of Art. 14 of the Arkansas Constitution. I can see it no other way.
But it has been said that when we adopted our Constitution in 1874, the rule of "separate but equal" governed in school matters, and that when the United States Supreme Court revolutionized that rule by the decision of Brown v. Board of Education in 1954, then the State of Arkansas *900 had a right to change its policy on public education. It is true that the State has a right to change its policy on public education : but the point is, that Art. 14 of our Constitution has not been repealed by vote of the People of Arkansas,[5] and until Art. 14 of the Constitution is repealed, this Court must continue to test legislation by the Constitution as it is, and not by what we think it may be in the future. Two wrongs will never make a right: just because the Supreme Court of the United States went contrary to the Federal Constitution in Brown v. Board of Education, is no reason or excuse why this State Court should go contrary to our State Constitution. Until the People of Arkansas repeal Art. 14 of our Constitution, this Court should obey Art. 14, which guarantees that the State shall maintain free schools. Act No. 4 violates that constitutional guaranty. If the People of Arkansas want to strike Art. 14 from the Constitution, then the schools may be closed under some legislation similar to Act No. 4. But until Art. 14 of the Constitution is repealed, then it is my solemn and sincere view that Act No. 4 is violative of the Arkansas Constitution.
III. Police Power. These words are used to express various legal concepts, and a distinction of use is necessary. In this case, the words, "police power", have at least three different concepts:
(1) The power reserved to the States, as contrasted to the Federal power;
(2) The inherent power of the State Legislative department; and
(3) The emergency powers of the Legislative or Executive Department.
In the present case I am not concerned with the first application (i. e. State v. Federal) because I never reach any Federal question; and all the cases about "reserved powers of the State" are entirely beside the mark, as I see the case. Act No. 4 violates the State Constitution; and so I never reach any Federal question. I will, however, discuss concepts 2 and 3 (supra) to show that Act No. 4 cannot be upheld on the basis of police power.
The rule is recognized everywhere that the police power of the State Legislature is limited by the State Constitution. In 16 C.J.S. Constitutional Law § 196, p. 949, cases from over a score of jurisdictions are cited to sustain this statement: "Limited by state constitution. However broad the scope of the police power, it is always subject to the rule that the legislature may not exercise any power that is expressly or impliedly forbidden to it by the state constitution, nor may constitutional guaranties and limitations be set aside by an application of such power, because of changed economic, sociological, or political conditions". In Gaines & Co. v. Holmes, 154 Ga. 344, 114 S.E. 327, 331, 27 A.L.R. 98, the Supreme Court of Georgia quoted this language: "`If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety * * * is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution'". In People v. Chicago, M. & St. P. R. Co., 306 Ill. 486, 138 N.E. 155, 158, 28 A.L.R. 610, the Supreme Court of Illinois quoted this language: "`* * * no exercise of the police power can disregard the constitutional *901 guaranties in respect to the taking of private property, due process and equal protection' of the laws, and should not `override the demands of natural justice.'" In Goldman v. Crowther, 147 Md. 282, 128 A. 50, 54, 38 A.L.R. 1455, the Maryland Court of Appeals quoted this language regarding the police power: "`But necessarily it has its limits and must stop when it encounters the prohibitions of the Constitution'". In Cooley on "Constitutional Limitations" 8th Ed. p. 1229, in speaking of the police power, this appears: "But the power is subject to the limitations imposed by the * * * State Constitutions upon every power of government, and it will not be suffered to invade or impair the fundamental liberties of the citizens".
In short, the Arkansas Legislature cannot, under the guise of police power, enact legislation contrary to the Arkansas Constitution. To hold otherwise would make the Constitution of no protection. So, in the case at bar: the guaranty contained in Section 1 of Art. 14 of the Arkansas Constitution is for the maintenance of schools; and this guaranty cannot be nullified by the Legislature under the guise of the police power, because such power does not extend to legislation violating our own Constitution.
I come then to concept 3 of the police power (i. e. the emergency power). There is a line of cases which says that statutes may be enacted by the Legislature, or Proclamation made by the Governor, to cope with unusual emergencies and exigencies. This is discussed in 11 Am.Jur. 979, "Constitutional Law" § 252, "Emergency Police Legislation". But the cases on such emergency police legislation recognize that a law dependent upon the existence of an emergency can only apply to an emergency situation; and that such a law ceases to operate when the emergency is past; and that it is the duty of the Courts to decide as to the existence and the end of the emergency.
Of course, in time of plague, pestilence, or other great danger, schools can be closed as health measures or police measures; but this is only for the emergency. In the case at bar, the closing is permanentnot merely until some plague or pestilence or danger has subsided, butthe schools will be closed as long as there is a threat of racial integration in the schools. That is too long. An entire generation could grow upand probably willwhile we are striving to get a Supreme Court of the United States that will overrule Brown v. Board of Education and return to the constitutional doctrine of "separate but equal". Meantime, are the schools to remain closed? They have already been closed for nearly a whole school year. Under Act No. 4 they could be closed for an entire generation. Thus it is clear that Act No. 4 cannot be sustained under any theory of "Emergency Police Powers", because we are not dealing with the kind of an emergency that permits the use of "Emergency Police Powers". Rather, we are dealing with a condition that has already existed since 1954 and will continue to exist until either the United States Constitution is amended or the United States Supreme Court overrules Brown v. Board of Education.
Two wrongs do not make a right. Let the Supreme Court of Arkansas stay within the Arkansas Constitution, even if the United States Supreme Court has not stayed within the Federal Constitution. Section 1 of Art. 14 of the Arkansas Constitution says: "* * * the State * * * shall ever maintain a general * * * system of free schools * * *." The State is not "maintaining", and never will "maintain" such a system under Act No. 4; and so I sincerely and solemnly say that Act No. 4 violates Section 1 of Art. 14 of the Arkansas Constitution and should be stricken.
NOTES
[*] Justice Johnson joined in this opinion.
[1] The pertinent part of Section 17 provides: "No bill of attainder, ex post facto law or law impairing the obligation of contracts shall ever be passed."
[2] Emphasis supplied.
[3] Emphasis supplied.
[4] Even if these portions of the Act be considered invalid, Act 4 contains a severance clause, Section 5, which recites that if any section or provision shall be held unconstitutional, such holding shall not affect the remainder of the Act. The late Justice Frank Smith, in a concurring opinion in the Reiman case, said: "However, Act No. 21 and much similar legislation passed at the same session of the General Assembly manifests the purpose to accord the debtor the greatest indulgence which may be granted, and it is therefore reasonably certain that the legislation would have been enacted even though section 2 were eliminated. It is well settled that the unconstitutional portion of a statute may be stricken out without impairing the effect of the remainder where the provisions are wholly independent and it can be seen that the lawmakers would have enacted the remaining part of the statute * * *." [188 Ark. 983, 68 S.W.2d 472.]
[5] Section 1, Article 14: "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction."
[6] Of course, many school districts have been consolidated or annexed under legislative authority, where it appeared consolidation would be beneficial. This procedure has been followed for a long number of years, and has been many times declared valid.
[1] Under our system of separate but equal schools between the white and negro races, as repeatedly recognized by the United States Supreme Court, the Southern Negro has enjoyed educational facilities and opportunities for racial advancement far superior to those enjoyed by members of that race crowded into ghettos in northern cities. If it would accomplish anything constructive, I would write an entire treatise on why Brown v. Board of Education is unconstitutional: it is an invasion of the Legislative powers of the Congress, as well as an invasion of the powers reserved to the States in matters of education and local concern. But nothing can be gained, in a decision of the present case, by a further discussion of Brown v. Board of Education; because I base my views entirely on the Constitution of the State of Arkansas.
[2] The entire argument in the appellant's brief is: "The appellant stands on the plain language of Article 14 of the State Constitution. It is our contention that the plain language of that Article is subject to but one interpretation, and that is that the State shall ever maintain a general, suitable and efficient system of free schools. Hence, any legislation, or official act thereon, closing a school, except for the peace, health and safety of the public, is diametrically opposed to Section 1 of Article 14. The Court will take judicial knowledge of the reason for the closing of the schools involved. The lower court should be reversed with directions to sustain the prayer in the complaint."
[3] Under Act No. 4 the Governor of Arkansas issued a Proclamation (of which we take judicial notice) on September 12, 1958 closing the public senior high schools of the Little Rock School District; and another Proclamation on September 16th, calling an election for September 27, 1958. At that election the majority vote was against integration; so the four public senior high schools of the Little Rock School District have been closed ever since September, 1958 and an entire school year will soon be completed with no public senior high schools having been maintained in the Little Rock School District.
[4] Webster's Unabridged Dictionary says that "maintain" means, inter alia, "* * to hold or keep in any particular state or condition * * * to support * * not to suffer to fail or decline * * * to bear the expense of * * * to carry on * * * to give support to * * *."
[5] Amendment No. 44 to the Arkansas Constitution was not mentioned in any of the briefs. That Amendment certainly does not expressly repeal Section 1, Art. 14 of the Arkansas Constitution. Neither does Amendment No. 44 impliedly repeal said Section 1 of Art. 14, because implied repeals are not favored, either in constitutional or statutory construction (16 C.J.S. Constitutional Law § 7, p. 35 and § 42, p. 131). One might just as well argue that the Amendment No. 44 impliedly repeals Art. 2 of the Arkansas Constitution (the declaration of rights) as to argue that it impliedly repeals Art. 14 of the Arkansas Constitution, which guarantees the maintenance of free schools.